LEVENSON AND KLEIN, INCORPORATED, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

WILLIAM I. LEVENSON AND GLORIA LEVENSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4060–75, 4061–75.   Filed January 24, 1977.

---

*Julian I. Jacobs* and *David P. Gordon,* for the petitioners.
*Fred G. Gerald,* for the respondent.

STERRETT, *Judge:* Respondent determined deficiencies in the income tax of petitioners William and Gloria Levenson for the calendar year 1972 in the amount of $2,074, and of petitioner Levenson & Klein, Inc., for the taxable years ended January 31, 1971, 1972, and 1973 in the respective amounts of $19,923.48, $30,242.15, and $33,292.85. These cases have been consolidated for trial due to the relationship of the petitioners and the continuity of the facts involved. Concessions having been made by the parties, the issues remaining for decision are as follows:

(1) Whether the respondent erred in determining that the salary paid by Levenson & Klein, Inc. (L. & K. or the corporation), to Reuben H. Levenson (Reuben) was unreasonable and excessive for each of the corporation's years in issue.

(2) Whether rent paid by L. & K. for its retail store located at Route 40 West at Rolling Road, in each of its 3 fiscal years involved, was an ordinary and necessary business expense under section 162, I.R.C. 1954.

(3) Whether certain legal and professional fees paid by L. & K. during its fiscal year ended January 31, 1973, are deductible as ordinary and necessary business expenses and/or amortizable as capital expenditures.

(4) Whether respondent erred in determining that payment by L. & K. of certain legal and professional fees constituted preferential dividends to petitioners William and Gloria Levenson, during their 1972 calendar year.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioner L. & K. is a corporation, organized on March 26, 1924, under the laws of Maryland, with its principal office at Baltimore, Md. L. & K. timely filed its Federal corporate income tax returns for the fiscal years ended January 31, 1971, 1972, and 1973 with the Internal Revenue Service Center, Philadelphia, Pa.

Petitioners William I. and Gloria Levenson, husband and wife, resided in Stevenson, Md., at the time their petition herein was filed. Their joint Federal income tax return for the taxable year 1972 was timely filed with the Internal Revenue Service Center, Philadelphia, Pa.

L. & K. was founded in 1919 by Reuben H. Levenson, Morris Klein (Morris), and Joseph Klein (Joseph). Morris was the father of Joseph and the father-in-law of Reuben. The business originated as a partnership and was incorporated in 1924. Except for a relatively small stock interest once briefly held by Morris, the stock of L. & K. was divided evenly between Reuben, his family (the Levensons), and Joseph and his family (the Kleins) from 1924 until December 30, 1959. On December 30, 1959, L. & K. purchased the entire stock interests of the Kleins; since such purchase the business has remained entirely in the hands of the Levensons.

As a result of several recapitalizations, the capital structure of the corporation has been changed from an original authorization of one class of stock (common) to the present three classes (viz, common, first preferred, and second preferred). At January 1, 1970, L. & K.'s authorized capital structure was as follows:

| Type of stock | Shares authorized | Shares issued and outstanding |
|---|---|---|
| Common, par value $50 | 5,000 | 1,250 |
| First preferred, par value $50 | 15,000 | 5,260 |
| Second preferred, par value $50 | 20,000 | 12,000 |

Both classes of the corporation's preferred stock call for a 4-percent, noncumulative annual dividend. Each share of common stock entitles the holder to one vote. The holders of the first preferred stock have no voting rights. Until December 7, 1970, the holders of the second preferred stock had, as a class, 50 percent of the voting rights in the corporation. On December 7, 1970, the corporation's charter

was amended and the voting privileges of the second preferred stock were eliminated. As a result of the amendment, only the holders of the corporation's common stock are entitled to vote.

Reuben is married to Miriam Levenson (Miriam); they have four children; viz, William I. Levenson (William), Frances Steinberg (Frances), Myra Askin (Myra), and Bertha Friedberg (Bertha).

As of January 1, 1970, L. & K.'s outstanding capital stock was owned as follows:

*Common stock.*—All 1,250 shares of common stock were held by Reuben and William as voting trustees under a voting trust agreement, dated December 30, 1961. At January 1, 1970, the holders of the voting trust certificates were as follows:

|  | Shares |
|---|---|
| William | 925 |
| Gloria (William's wife) | 80 |
| William and Gloria, as tenants by the entireties | 20 |
| William as custodian for his children[1] | 225 |
| Total | 1,250 |

*First preferred stock:*

|  | Shares |
|---|---|
| William | 2,880 |
| William as custodian for his children | 714 |
| The children of Reuben's daughters (in fee and parents as custodian for) | 1,666 |
| Total | [2]5,260 |

*Second preferred stock.*—All 12,000 shares of second preferred stock were owned by Reuben. On February 15, 1971, the children of the daughters of Reuben had their first preferred shares redeemed for $25 per share.

The voting trust agreement dated December 30, 1961, was due to terminate on December 29, 1971. On December 7, 1970, a new voting trust agreement was executed and its duration extended until December 6, 1980. Therefore, since February 15, 1971, William, his wife, and his children have been the beneficial owners of all the common and first preferred stock of the corporation; all the second preferred stock has been owned by Reuben.

---

[1] William was the custodian for his son Jerrold's 125 shares; his daughter Judith's 75 shares; and his daughter Emily's 25 shares.

[2] The children and grandchildren of Reuben acquired their respective equity interests in L. & K. as a result of gifts made to them by Reuben at various times and in varying quantities.

On March 24, 1972, L. & K., Reuben, Miriam, and William entered into two agreements which in essence provided that, upon Reuben's death, L. & K. will purchase as many shares of Reuben's second preferred stock as is necessary to pay estate and inheritance taxes imposed because of the inclusion of such shares in Reuben's taxable estate; the remaining L. & K. shares owned by Reuben at the time of his death to be devised by Reuben in his last will and testament to William's son, Jerrold.

Since its inception, L. & K. has been engaged in the business of selling furniture, home furnishings, and appliances at retail in the metropolitan Baltimore, Md., area. Until 1964 L. & K. had only one retail store located in Baltimore City. In 1964 the corporation opened a second retail store in Baltimore County; and in 1973 a third retail store was opened, also in Baltimore County. L. & K. warehouses its merchandise at three separate locations, the third being its store location opened in 1973. For the past 30 years, L. & K. has leased all the various buildings used in its business.[3]

L. & K. is one of the, if not the, largest independent home furnishings retailers in Maryland. It is organized along departmental lines, having 26 separate merchandising departments. The corporation employs between 350–400 people. The corporate enterprise is divided into three distinct areas: (1) Operations, (2) merchandising, and (3) credit and collection. The importance of each function on a 10-point scale is roughly 4 points for merchandising, 4 points for credit and collection, and 2 points for operations.

Between 80 to 90 percent of the corporation's sales are on credit, and L. & K. does not factor its accounts receivable. Its accounts receivable, during the taxable years in issue, constituted over 70 percent of its assets. The corporation does not accept customers' commercial credit cards but instead relies upon its own credit system. Approximately 10 to 20

---

[3] The original retail store is located at Monument and Chester Streets, Baltimore City. The second retail store is located on Route 40 West at Rolling Road; the third at 8645 Pulaski Highway, Baltimore County. Warehouse locations are: (1) 2827 E. Preston Street, Baltimore City; (2) 930 E. Monument Street, Baltimore City; and (3) 8645 Pulaski Highway. Approximately 65 percent of the Pulaski store is used for retailing; the remainder as a warehouse. The properties, their owners, and lessors are described in greater detail, *infra.*

percent of its credit sales are 30–60–90-day accounts where no interest carrying charges are required with the customer paying the balance due on the sale within 90 days. The remaining credit sales require carrying charges and are long-term transactions extending up to 24 months.

For the corporation's years at issue, the ratio of L. & K.'s bad debts to credit sales was as follows:[4]

| FYE Jan. 31— | Bad debts | Credit sales | Ratio |
|---|---|---|---|
| 1971 | $28,652 | $8,374,255 | .34% |
| 1972 | 40,555 | 8,589,731 | .47% |
| 1973 | 45,239 | 9,420,659 | .48% |

From the founding of L. & K. until January 31, 1973, Reuben was its chief executive officer. On January 31, 1973, Reuben, 83 years old, turned the presidency over to his son, William. Reuben remained chairman of the board. From January 1, 1960, until January 31, 1973, the officers of L. & K. were as follows:[5]

Reuben ..................... President
William ..................... Vice president and
                                        secretary
William's wife ......... Vice president
Reuben's wife .......... Treasurer

During the taxable years in question, Reuben worked several hours per day, usually 5 days per week and one-half of the day on Saturday. He was rarely absent from work other than during his annual vacations of between 4 to 6 weeks.

William has been employed full time by L. & K. since 1946. During the years in issue, William worked 51 to 52 weeks per year, 42 to 72 hours per week, probably more hours than any other employee. He learned the business from the bottom up, working in sales, warehousing, shipping, and collection. When L. & K. purchased the Kleins' corporate interests in 1959, William became a vice president. Reuben believed that his son should be an equal "partner" in the business. Reuben and William agreed, shortly after William became an officer, that someday William would be the sole owner of L. & K.

---

[4] L. & K. is on the reserve method.

[5] The officers constituted all the directors of the corporation.

Reuben's primary responsibility is the corporate function of credit and collection. William is primarily responsible for merchandising, advertising, and operations. As previously stated, the corporate organization is rather complex with each department and subdepartment having corporate heads reporting either to Reuben or William. Although William ran the operations and merchandising functions, no major corporate decision in these or any area of the business was made without consultation between William and Reuben.

Reuben formulated and promulgated written credit and financial policies for L. & K. L. & K.'s controller, his staff, and the credit staff implemented these policies. These credit and collection departments are well trained. Although Reuben does not supervise every "turn down" of credit, he is constantly in touch with his credit manager and, where there is a questionable case or a dispute between the commission salesmen making the sale which was rejected and the credit man, Reuben mediates the dispute. Of his 5½-day workweek, Reuben spends approximately 3 days per week on collection matters. He has a secretary assigned to him exclusively 3 days a week and on other days uses the services of other secretaries.

Reuben checks warehouse operations several times a month and regularly visits the other L. & K. retail stores. He attends weekly staff meetings that average 2 to 4 hours and assumes William's duties and responsibilities when his son is on business trips. Such trips approximate 4 to 10 weeks per year. Additionally, Reuben plays an important role in training personnel and in the area of customer service. Many of the store's customers are personally known to him and L. & K. has serviced more than one generation of the same family.

On January 1, 1970, Reuben entered into an employment agreement with L. & K. pursuant to which the corporation agreed to pay him a salary of $55,000 per year or the same salary paid to William during the year, whichever was greater. Under this agreement in the event of his disability, death, or retirement, at anytime, or his election to work for the corporation as a corporate consultant-adviser on a part-time basis, not to exceed 2 full days in any week, Reuben and/or his widow, are to be paid annually 70 percent of his pension base salary (defined to mean the greater of $55,000

per year, the amount of salary paid to Reuben at the time of his retirement, disability, or death, or an amount equal to William's salary at the time of the payment). This agreement formally employed Reuben in the performance of services of "an executive and managerial nature as may be designated by the board of directors." The agreement memorialized the terms of the December 30, 1959, oral agreement between Reuben and the corporation. Reuben's and William's yearly salaries were set after discussions between themselves.

In 1963 L. & K. established a pension plan, effective January 1, 1963. Due to his age Reuben was not eligible to become a participant in such plan. As of February 11, 1953, the corporation's profit-sharing plan was terminated and has not been reestablished. Also, L. & K. provides its employees with life insurance and major medical and salary continuance insurance. Due to Reuben's age he was excluded from participating in these plans.

For income tax purposes, L. & K. reports its income using the installment method of accounting; for financial reporting purposes, it reports its income under the accrual method of accounting. Under the installment method of accounting, revenues are not recognized until, and as, cash is collected. Under the accrual method of accounting, revenues are recognized when sales occur. The corporation's net sales, officers' compensation, ratio of officers' compensation to net sales, total compensation paid to all employees, ratio of compensation of all employees to net sales, net income before income taxes under both the accrual and installment accounting methods, and ratio of officers' compensation to net income before taxes under both the accrual and installment accounting methods for fiscal years ended January 31, 1965, through January 31, 1973, are as follows:

| Reuben Levenson's compensation | William Levenson's compensation | Total officers' compensation | Ratio of officers' compensation to net sales | Compensation to all employees | Ratio of compensation to all employees to net sales |
|---|---|---|---|---|---|
| $40,000 | $40,088 | $80,088 | 1.64% | $997,653 | 20.39% |
| 45,000 | 43,375 | 88,375 | 1.53 | 1,140,073 | 19.71 |
| 45,000 | 45,398 | 90,398 | 1.43 | 1,258,184 | 19.87 |
| 47,400 | 48,220 | 95,620 | 1.38 | 1,409,050 | 20.27 |
| 52,800 | 52,919 | 105,719 | 1.39 | 1,599,420 | 21.03 |
| 56,547 | 56,473 | 113,020 | 1.42 | 1,723,240 | 21.69 |
| 58,898 | 59,014 | 117,912 | 1.35 | 1,906,762 | 21.88 |

| 63,200 | 63,762 | 126,962 | 1.30 | 2,115,593 | 21.72 |
| 64,437 | 64,437 | 128,874 | 1.19 | 2,346,713 | 21.76 |

| | | Ratio of officers' compensation to net income before income taxes | |
| --- | --- | --- | --- |
| *Net income before income taxes* | | | |
| *Accrual basis* | *Installment basis* | *Accrual* | *Installment* |
| $185,775 | $5,015 | 43.11% | 1596.97% |
| 379,710 | 124,255 | 23.27 | 71.12 |
| 366,141 | 204,303 | 24.69 | 44.25 |
| 477,413 | 233,695 | 20.03 | 40.92 |
| 453,368 | 297,931 | 23.32 | 35.48 |
| 418,483 | 310,373 | 27.01 | 36.41 |
| 556,606 | 373,738 | 21.18 | 31.55 |
| 543,377 | 370,594 | 23.37 | 34.26 |
| 568,429 | 277,810 | 22.67 | 46.39 |

Under the accrual method of accounting, L. & K.'s balance sheet for the fiscal years ended January 31, 1965, through and including January 31, 1973, is reflected in table 1.

Under the installment method of accounting the retained earnings account is reduced to reflect the "unrealized gross profit," which is classified as an "other liability" on the corporation's tax return. For the fiscal years ended January 31, 1970, through and including January 31, 1973, these amounts are as follows:

| *FYE Jan. 31—* | *Unrealized gross profit* | *Retained earnings* | *Retained earnings on accrual method* |
| --- | --- | --- | --- |
| 1970 | $1,866,732 | $291,485 | $2,158,217 |
| 1971 | 2,024,558 | 475,768 | 2,500,326 |
| 1972 | 2,166,048 | 665,588 | 2,831,636 |
| 1973 | 2,416,974 | 808,348 | 3,225,322 |

During fiscal years ended January 31, 1965, to and including January 31, 1973, L. & K. paid no dividends to its shareholders.

In his notice of deficiency dated March 18, 1975, respondent for each of the 3 corporate fiscal years in issue disallowed compensation paid by L. & K. to Reuben in excess of $27,500 each year. Such excess was deemed an "[unreasonable] allowance for salary or other compensation for personal services actually rendered within the ambit of section 162."

As noted previously, until 1964 L. & K. had only one retail store, that being located at Monument and Chester Streets, Baltimore City. In 1964 L. & K. expanded and opened its

Rolling Road store. In 1973 a third retail store was opened at Pulaski Highway.

L. & K.'s warehouse at 930 E. Monument Street is leased from a person unrelated to either the Levensons or the Kleins. L. & K.'s main warehouse located at 2827 E. Preston Street is leased from Prestlin Realty Co., a general partnership (Prestlin). Prior to March 31, 1969, the ownership of Prestlin was evenly divided between the Kleins and the Levensons. On March 31, 1969, the Kleins sold their 50-percent interest in Prestlin to the Levensons. Since 1970 the ownership of Prestlin Realty Co. has been evenly divided between Myra, Bertha, a trust created by William, and a trust created by Frances.

The retail store located at Monument and Chester Streets is leased from Miriam Levenson Associates. Prior to December 30, 1959, the property at Monument and Chester Streets was owned by Miriam and Virginia S. Klein (the wife of Joseph) as tenants in common. On December 30, 1959, Virginia S. Klein sold her interest in the property to Miriam. On May 26, 1961, L. & K. leased the property from Miriam. On August 31, 1961, Miriam contributed the property to Miriam Levenson Associates, a newly formed limited partnership in which Miriam was, and presently is, the sole general partner; Frances, Myra, Bertha, and William constitute all the limited partners. Over the years, Miriam has reduced her interest in Miriam Levenson Associates by making gifts thereof to her children. As a result of these gifts, since January 1, 1970, Frances, Myra, and Bertha have collectively held over 75 percent of the interests in Miriam Levenson Associates, and William, approximately 9 percent.

For the last 30 years L. & K. has leased the various buildings used in its business. It was corporate policy not to buy "bricks." Following this longstanding policy, when L. & K. selected the tract of land located at Route 40 West at Rolling Road for the location of its new retail store, Rolling Forty, Inc., a corporation organized under the laws of Maryland, was formed for the purpose of subleasing the land from a real estate developer, unrelated to the Levensons and Kleins. Rolling Forty, Inc., built a store on such property and leased it to L. & K. pursuant to an agreement dated September 16, 1963.

TABLE 1

LEVENSON & KLEIN, INC.

Comparative Balance Sheets

At January 31, 1965 - January 31, 1973, Inclusive

| ASSETS | 1/31/65 | 1/31/66 | 1/31/67 | 1/31/68 | 1/31/69 | 1/31/70 | 1/31/71 | 1/31/72 | 1/31/73 |
|---|---|---|---|---|---|---|---|---|---|
| *Current assets:* | | | | | | | | | |
| Cash: | | | | | | | | | |
| Unrestricted | $69,771 | $50,244 | $115,513 | $151,884 | $102,965 | $129,580 | $128,071 | $18,014 | $(524) |
| Restricted[1] | 65,995 | 56,339 | 6,712 | 26,050 | 68,866 | 65,741 | 74,382 | 176,154 | 139,372 |
| Total Cash | 135,766 | 106,583 | 122,225 | 177,934 | 171,831 | 195,321 | 202,453 | 194,168 | 138,848 |
| Accounts receivable trade (net)[1] | 2,536,421 | 3,070,718 | 3,455,426 | 3,929,108 | 4,282,460 | 4,454,336 | 4,746,504 | 5,125,249 | 5,701,050 |
| Other receivables | 29,509 | 22,652 | 15,525 | 9,697 | 11,139 | 43,978 | 42,428 | 63,354 | 54,055 |
| Merchandise inventory | 1,095,461 | 950,677 | 920,289 | 1,052,577 | 1,206,879 | 1,147,229 | 1,376,193 | 1,518,153 | 1,819,687 |
| Prepaid taxes, insurance, etc. | 49,105 | 20,914 | 29,755 | 27,957 | 28,483 | 39,933 | 61,336 | 66,504 | 77,073 |
| Total current assets | 3,846,262 | 4,171,544 | 4,543,220 | 5,197,273 | 5,700,792 | 5,880,797 | 6,428,914 | 6,967,428 | 7,790,713 |
| *Other assets:* | | | | | | | | | |
| Investments | 14,900 | 1,900 | 4,358 | 3,458 | 3,458 | 3,458 | 3,458 | 3,480 | 3,480 |
| Insurance deposits | 7,696 | 8,284 | 4,798 | 5,153 | 5,508 | 5,508 | 5,750 | 5,750 | 5,750 |
| *Property, plant and equipment:* | | | | | | | | | |
| Furniture, fixtures, and signs (net) | 20,625 | 22,073 | 34,430 | 35,838 | 29,976 | 26,402 | 20,133 | 26,595 | 21,271 |
| Leasehold improvements (net) | 173,111 | 159,664 | 162,575 | 161,141 | 142,330 | 141,469 | 142,600 | 165,065 | 139,044 |
| Automobile and delivery equipment (net) | 20,066 | 24,545 | 23,912 | 21,094 | 26,500 | 29,552 | 34,463 | 44,854 | 47,352 |
| Goodwill | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Total | 4,082,661 | [2]4,388,011 | 4,773,294 | 5,423,958 | 5,908,565 | 6,087,187 | 6,635,319 | 7,213,173 | 8,007,611 |

| LIABILITIES | 1/31/65 | 1/31/66 | 1/31/67 | 1/31/68 | 1/31/69 | 1/31/70 | 1/31/71 | 1/31/72 | 1/31/73 |
|---|---|---|---|---|---|---|---|---|---|
| *Current liabilities:* | | | | | | | | | |
| Accounts payable-trade | $515,683 | $431,401 | $382,666 | $462,156 | $492,493 | $383,300 | $590,746 | $650,293 | $768,549 |
| Accounts payable-other | 165,234 | 75,137 | 65,633 | 67,649 | 49,444 | 49,945 | 37,993 | 55,422 | 61,680 |
| Provision for Federal and State income taxes | 509 | 55,878 | 101,719 | 112,527 | 121,174 | 128,684 | 78,382 | 34,861 | 34,861 |
| Taxes payable-other | 75,648 | 54,505 | 54,108 | 34,304 | 37,812 | 38,464 | 38,361 | 34,214 | 16,505 |
| Accrued payroll and expenses | 76,096 | 109,650 | 124,211 | 131,138 | 143,536 | 141,077 | 177,011 | 175,197 | 209,955 |
| Total current liabilities | 833,170 | 726,071 | 728,337 | 807,774 | 844,459 | 741,470 | 922,493 | 949,987 | 1,056,689 |
| Notes payable for redeemed stock | | | | | | | | 35,700 | 29,750 |
| Note payable-bank¹ | 1,600,000 | 1,700,000 | 1,830,000 | 2,050,000 | 2,200,000 | 2,250,000 | 2,275,000 | 2,500,000 | 2,800,000 |
| Total liabilities | 2,433,170 | 2,426,071 | 2,558,337 | 2,857,774 | 3,044,459 | 2,991,470 | 3,197,493 | 3,485,687 | 3,886,439 |
| STOCKHOLDERS' EQUITY | | | | | | | | | |
| *Contributed capital:* | | | | | | | | | |
| Preferred stock: | | | | | | | | | |
| First preferred | 275,000— | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 275,000 | 191,700 | 191,700 |
| Second preferred | | | | | 600,000 | 600,000 | 600,000 | 600,000 | 600,000 |
| Common stock | 200,000 | 200,000 | 200,000 | 200,000 | 62,500 | 62,500 | 62,500 | 62,500 | 62,500 |
| Paid-in capital-stock redemption gain | | | | | | | | 41,650 | 41,650 |
| Retained earnings | 1,761,366 | 2,073,815 | 2,326,832 | 2,678,059 | 1,926,606 | 2,158,217 | 2,500,326 | 2,831,636 | 3,225,322 |
|  | 2,236,366 | 2,548,815 | 2,801,832 | 3,153,059 | 2,864,106 | 3,095,717 | 3,437,826 | 3,727,486 | 4,121,172 |
| Less: Treasury stock (at cost) | 586,875 | 586,875 | 586,875 | 586,875 | | | | | |
| Total stockholders' equity | 1,649,491 | 1,961,940 | 2,214,957 | 2,566,184 | 2,864,106 | 3,095,717 | 3,437,826 | 3,727,486 | 4,121,172 |
| Total liabilities and stockholders' equity | ³$4,082,611 | 4,388,011² | 4,773,294 | 5,423,958 | 5,908,565 | 6,087,187 | 6,635,319 | 7,213,173 | 8,007,611 |

¹ All trade accounts receivable are pledged to the bank as security for the bank note. Under the terms of the bank loan agreement all cash received on customer's account must be deposited in a special bank account (herein reported as "restricted cash") which is also pledged as security for the bank note. Transfers from the restricted cash account to the checking account of the corporation are made in whole or part at the discretion of the bank.

² Total should be $4,388,010, discrepancy is apparently caused by the omission of goodwill at $1.

³ The correct figure should be $4,082,661.

On September 16, 1963, the stock of Rolling Forty, Inc., was owned as follows:

| | Shares |
|---|---|
| Reuben's daughters | [6]4,800 |
| Reuben | 200 |
| William | 5,000 |
| Total | 10,000 |

On December 26, 1970, William transferred his stock in Rolling Forty, Inc., to a trust for the benefit of his son, Jerrold. On January 25, 1971, Reuben gave his stock in Rolling Forty, Inc., to his three daughters, equally. Shortly thereafter Rolling Forty, Inc., was liquidated, and all of its assets were transferred to, and all its liabilities were assumed by, Rolling Forty Associates (Rolling Associates), a general partnership. The partners of Rolling Associates were the same individuals who had been shareholders of Rolling Forty, Inc., each maintaining his or her percentage ownership.

The retail store located at 8645 Pulaski Highway is leased from 8645 Pulaski Highway Associates (Pulaski Associates), a limited partnership, pursuant to a lease dated March 7, 1973. The partners of Pulaski Associates and their respective capital interests are as follows:

| General partners | Capital percentage |
|---|---|
| William | 5 |
| Gloria Levenson | 5 |
| Limited partners | |
| William | 20 |
| Gloria Levenson | 20 |
| Gloria Levenson, custodian for Jerrold, her son | 12.5 |
| Bertha | 12.5 |
| Frances | 12.5 |
| Myra | 12.5 |
| Total | 100.0 |

The partnership agreement provides, in part, that the general partners shall have the exclusive rights to manage the partnership and make all decisions. It was Reuben's overall estate plan to give his son, William, full control of L. & K. and

---

[6] Each of Reuben's three daughters owned 1,600 shares. William was president of Rolling Forty, Inc.

provide his wife and daughters, but primarily his daughters, with the income from the various real estate companies organized to lease property to L. & K. Neither Frances, Bertha, Myra, nor Reuben's wife, Miriam, played any part in the operation of the entities in which they held their respective interests. They relied upon Reuben to represent them and to negotiate and set the terms for the various leases. The management and operation of these entities were solely conducted by Reuben. Accordingly, Reuben conducted the various lease negotiations on behalf of these entities and William represented L. & K. Although William owned, directly or indirectly, interests in all the landlords, and Reuben was president and chairman of the board of L. & K. primarily, each "looked out" for his respective interests, William—L. & K., and Reuben—his wife's and daughters' security. Therefore in negotiations between the two, decisions reached were deemed fair to both sides. Although they had their differences, heated at times, one could nevertheless characterize the negotiations as "round table" (as distinguished from "across the table") discussions between father and son.

On January 31, 1970, the lease dated January 11, 1955, for the Preston Street warehouse expired. On October 14, 1970, an amendment of lease was executed, effective as of January 30, 1970, which, among other things, extended the lease term to April 30, 1982. The rent was increased from $36,000 per year, net, to $46,000 per year, net; the fair rental value for such property was $48,000, net.

On May 26, 1971, the lease for the Monument and Chester Streets store expired. On June 28, 1971, an amendment of lease was executed extending the lease term to July 30, 1981. The rent remained $92,000 per year on a net basis; whereas the fair rental value was a minimum of $92,000 a year against a percentage rent of 4 percent of sales.

On December 7, 1970, the sublease dated September 16, 1963, between Rolling Forty, Inc., and L. & K., was amended. Pursuant to the terms of said amendment the amount of rent was increased from $64,000.08 per year, gross, to an amount which would provide an absolute net return of $73,000 per year. At the date of this aforesaid amendment approximately 42 years, including renewal options, remained on this

sublease. The parties agree that as of the effective date of the amendment, November 1, 1970, the fair rental value of the lease premises was an amount which would provide an absolute net return of $100,000 per year to Rolling Forty, Inc. The rental, taxes, fire and public liability insurance, and parking lot fee paid by L. & K. for the Rolling Road property under the terms of the amendment for the corporate years in issue are as follows:

| FYE Jan. 31— | Rental | Taxes | Fire and public liability insurance | Parking lot fee | Total |
|---|---|---|---|---|---|
| 1971 | $66,251.07 | $2,739.36 | $2,046 | $3,000 | $74,036.43 |
| 1972 | 73,000.00 | 11,250.25 | 2,046 | 3,000 | 89,296.25 |
| 1973 | 73,000.00 | 11,676.68 | 2,023 | 3,000 | 89,699.68 |

Sales volume at the Rolling Road store for fiscal years ended January 31, 1965, through and including January 31, 1973, was as follows:

| FYE Jan. 31— | Sales | FYE Jan. 31— | Sales |
|---|---|---|---|
| 1965 | $1,020,834 | 1970 | $2,863,119 |
| 1966 | 1,646,467 | 1971 | 3,288,406 |
| 1967 | 1,981,711 | 1972 | 3,558,193 |
| 1968 | 2,285,609 | 1973 | 4,224,433 |
| 1969 | 2,648,654 | | |

Respondent in his notice of deficiency disallowed, in part, petitioner L. & K.'s rent deduction for each of its years in issue because "it has not been established that the disallowed amount constitutes ordinary and necessary business expense, and if expended, was expended for the purpose designated." The computation was as follows:

| FYE Jan. 31— | Rental | Taxes | Adjustment |
|---|---|---|---|
| 1971 | 3 months at $750 = $2,250 | 3 months at $913.12 = $2,739.36 | $4,989.36 |
| 1972 | 12 months at 750 = 9,000 | 5 months at 913.12 = 4,565.60 | 20,250.25 |
| | | 7 months at 954.95 = 6,684.65 | |
| 1973 | 12 months at 750 = 9,000 | 5 months at 954.95 = 4,774.75 | 20,676.68 |
| | | 7 months at 985.99 = 6,901.93 | |
| Total adjustment | | | 45,916.29 |

In the spring of 1972 business was booming and L. & K. needed additional warehouse space. A realtor brought to the corporation's attention a building formerly used as a corrugated box factory located at 8645 Pulaski Highway and owned

by Shorealty Co.[7] Originally L. & K. intended to use this property solely as a warehouse. However the corporation discovered Montgomery Ward was going to develop the property across the road as a shopping center and therefore L. & K. decided to use the property as a combined warehouse-retail store. The property was zoned for warehouse and not retail use and therefore required the granting of a zoning variance.

On November 1, 1972, L. & K., as lessee, executed an agreement to lease the Pulaski property from Shorealty Co. for a 12-month period commencing November 1, 1972. Pursuant to the provisions of this agreement, L. & K. was given the option to purchase the leased premises. The agreement further provided that L. & K. could assign its option to purchase the leased premises to 8645 Pulaski Highway Associates. L. & K. did not intend to own the property; rather, it intended to lease the property from a related entity, Pulaski Associates.

Immediately after gaining access to the property L. & K. began to use the property as a warehouse. L. & K. then applied to have the zoning classification changed and variances granted. Ultimately the property was rezoned for retail-warehouse use. Thereafter the option to purchase the property was assigned to, and timely exercised by, Pulaski Associates.

On March 7, 1973, L. & K., as tenant, executed an agreement to lease the Pulaski Highway property from Pulaski Associates for $85,000 per year, net, for a basic term of 17 years, renewable at the option of L. & K. for three additional and successive terms of 5 years.[8]

L. & K. believed it was more practical for it to pay the expenses incurred in connection with this rezoning and purchase of the property than Pulaski Associates. If Pulaski Associates had paid these fees, they would have amortized such expenses over the lease term and thereby increased the rent to L. & K. Thus L. & K. in order to keep the rent to a minimum did everything necessary to prepare this property.

---

[7] None of the partners of Shorealty Co. are related to Levensons.

[8] The record is inconclusive whether L. & K. or Pulaski Associates would have purchased the property had the rezoning application been denied. Reuben for L. & K. handled, almost completely, the rezoning change.

Therefore, the following expenses were incurred during its taxable year ended January 31, 1973, in connection with the rezoning of the Pulaski property, and paid for by L. & K.:

| | |
|---|---:|
| Legal fees and costs paid to Nolan, Plumhoff & Williams—retainer for rezoning classification | $1,050 |
| Fee to Ornsby S. Moore—appearance fee to testify before Baltimore County Zoning Commissioner | 250 |
| | 1,300 |

Also during the fiscal year ended January 31, 1973, L. & K. paid the law firm of Gordon, Feinblatt & Rothman $1,929.06 for services rendered in connection with the leasing and purchase of the Pulaski Highway property as follows:

| Date | Amount | Explanation |
|---|---|---|
| 9/1/72 | $305.00 | Purchase of Pulaski Road property from Shorealty Co. |
| 10/1/72 | 850.00 | Purchase of Pulaski Road property from Shorealty Co. |
| 11/1/72 | 20.00 | 8645 Pulaski Highway Associates |
| 11/1/72 | 735.00 | Purchase of Pulaski Road property from Shorealty Co. |
| 11/1/72 | 7.66 | Purchase of Pulaski Road property from Shorealty Co. |
| 11/1/72 | 11.40 | Lease of 8645 Pulaski Highway |
| Total | 1,929.06 | |

Additionally, during the taxable year ended January 31, 1976, L. & K. paid $250 to the firm of Tatar & Kelly for a feasibility study and $607.43 to Matz, Childs & Associates for site investigation in connection with the possible acquisition or leasing by L. & K. of property located at Joppa Road, Towson, Md. These expenses were unrelated to the Pulaski Highway property and the Joppa Road property deal never materialized.[9]

---

[9] For the 3 corporate years in issue respondent disallowed legal and professional fees of $2,121.60 for fiscal year ended Jan. 31, 1971, $2,048.82 for fiscal year ended Jan. 31, 1972, and $4,478.06 for fiscal year ended Jan. 31, 1973. L. & K. conceded the correctness of the respondent's determination in disallowing said legal fees for the years 1971 and 1972, and $999 of such fees for the fiscal year ended Jan. 31, 1973. Thus in view of these concessions the amount in dispute with respect to the deduction for legal and professional fees is limited to the fiscal year ended Jan. 31, 1973, in the amount of $3,479.06. (Gordon, Feinblatt & Rothman $1,929.06; Plumhoff & Williams $1,050; O. Moore $250; Tatar & Kelly $250.) Furthermore, the $607.43 fee paid to Matz, Childs & Associates, disallowed by respondent for L. & K.'s fiscal year ended Jan. 31, 1973, is characterized as a disallowed repair expense on the notice of deficiency.

In addition to disallowing as deductions claimed by L. & K. for the fiscal year ended January 31, 1973, the aforesaid amounts totaling $4,086.49, respondent determined in a separate notice of deficiency, dated March 18, 1975, to William and Gloria Levenson, that $3,836.49 of this corporate disallowance constituted a preferential dividend.[10]

OPINION

*Issue 1. Reasonable Compensation*

The initial issue presented is whether amounts paid to Reuben during the corporate years in issue constituted reasonable compensation for services actually rendered within the meaning of section 162(a)(1). The question is one of fact to be determined from all the facts and circumstances of the case. *Charles Schneider & Co. v. Commissioner,* 500 F.2d 148 (8th Cir. 1974), affg. a Memorandum Opinion of this Court; *Pepsi-Cola Bottling Co. of Salina, Inc.,* 61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir. 1975). The burden of proving reasonableness is upon petitioner, *Botany Worsted Mills v. United States,* 278 U.S. 282 (1929); *The Barton-Gillet Co. v. Commissioner,* 442 F.2d 1343 (4th Cir. 1971), affg. per curiam a Memorandum Opinion of this Court; and when the case involves a closely held corporation where the controlling shareholders-executives set their own compensation as executives, the reasonableness of such compensation necessitates our close scrutiny in order to determine if the payment of such alleged compensation is not, in fact, a distribution of corporate profits. *Miles-Conley Co. v. Commissioner,* 173 F.2d 958, 960 (4th Cir. 1949), affg. 10 T.C. 754 (1948).

As stated in *Mayson Mfg. Co. v. Commissioner,* 178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court, the pertinent facts and circumstances to be considered in a case of this type are as follows:

the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions

---

[10] The parties agree that the $3,836.49 is comprised of the aforesaid $4,086.49 less the $250 fee paid by L. & K. to Ornsby Moore.

in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * The situation must be considered as a whole with no single factor decisive.

Respondent argues on brief that the instant case is one of an individual who helped found a business, made major contributions to its growth and success, and still attempts to remain on the scene. In support of this argument, respondent maintains that Reuben's corporate duties were in the area of credit and collection, with these functions representing 40 percent of the corporate activity. In this area L. & K. had established written policies which were implemented by subordinates. Thus, respondent contends that Reuben's day-to-day involvement in corporate affairs was minimal, and Reuben was employed as an adviser-consultant on a part-time basis. Furthermore, comparison of William's compensation to his father's for the years in issue reveals the unreasonableness of Reuben's salary. William was responsible for approximately 60 percent of the corporate functions and worked approximately twice as many hours per week as his father. However, both received the same salary. Moreover, petitioner has not offered any evidence of salaries paid to individuals in comparable positions in comparable concerns. L. & K.'s overall salary policy is extremely conservative and examination of this policy in light of corporate statistics reveals that Reuben's salary was overly generous and excessive. Reuben believed he was adequately compensated in years prior to the fiscal year ended January 31, 1971, and any increases in salary, although increased by only a small percentage each year, were unreasonable when Reuben's active role in the corporation was decreasing. Reuben's employment contract with L. & K. was not approved by the board of directors or reflected in the corporate minute book.

Finally, respondent contends that under the voting trust of December 7, 1970, William and Reuben have equal voting power in L. & K. and considering the manner that salaries were established and set, especially in light of the fact that the corporation had not paid any dividends from its fiscal year ended January 31, 1965, to and including January 31, 1973, although there were substantial retained earnings for each

year, leads to the conclusion that L. & K. was distributing earnings under the guise of salary.

After careful review of the entire record, we have no difficulty in holding that the amount paid to Reuben for each of the corporate years in issue constituted reasonable compensation for services actually rendered within the ambit of section 162(a)(1). We have incorporated into our analysis, *infra,* the *Mayson* factors that we deem relevant to the facts and circumstances at hand.

The evidence shows that the services performed by Reuben were extensive, and he is responsible to a large extent for the financial success and growth of L. & K. Reuben was one of the founders of L. & K. and has served as its chief executive officer for more than 50 years. For the corporate years in issue he was both president and chairman of the board of L. & K., and his services rendered must be viewed in light of his office and the financial success of the corporation. Although Reuben's assigned corporate function was in the area of credit and collection, which function accounted for 40 percent of the total corporate operation, as president and chairman of the board he was involved in every major corporate decision. The testimony in the record indicates that he devoted a substantial amount of time to his work.

Respondent argues, and we have found, that on a 10-point scale, Reuben is primarily responsible for 4 points while William, his son, is responsible for the remaining 6 points. We have found that William worked more hours per week than any other L. & K. employee. Both received approximately the same salary for fiscal years ended January 31, 1971 and 1972, and the identical salary for 1973. However, Reuben was excluded from L. & K.'s pension plan, life insurance, and major medical corporate plans. Not doubting William's valuable worth to the corporation, we will not equate 1 hour of a chief executive's time, having over 50 years of industry experience, with that of an executive with approximately 27 years of expertise. Additionally, Reuben's high esteem among his peers in the industry and his role in the area of customer service make him an important asset of the corporation.

The fact that Reuben's employment agreement was not formally approved by the board of directors or reflected in the corporate minute book, as well as the lack of formality by

which Reuben and William set their salaries, is uneventful in our mind. Closely held corporations, as is well known, often act informally, "their decisions being made in conversations, and oftentimes recorded not in the minutes, but by action." *Reub Isaacs & Co.*, 1 B.T.A. 45, 48 (1924).

We have found that the corporation has not paid any dividends since 1965 although there were substantial profits. Respondent contends that L. & K. was distributing corporate earnings by paying excessive salary to Reuben. However we have found Reuben's salary to be reasonable. Additionally, analysis of the corporation's balance sheets for the years in issue shows L. & K. at its fiscal year end having unrestricted cash as follows:

| FYE Jan. 31— | Unrestricted cash position |
|---|---|
| 1971 | $128,071 |
| 1972 | 18,014 |
| 1973 | (524) |

The corporation's receivables were pledged as security for bank notes used in financing its revolving credit loan. Under the terms of the loan agreement cash received on trade receivables must be deposited in a special account, "restricted cash," which is also pledged as security for the bank loan. For each year in issue, as well as prior years, L. & K.'s current assets mainly consisted of inventory, receivables, and prepaid expenses. Payment of its trade accounts payable in any year would deplete its unrestricted cash account as well as its restricted cash account. Moreover, even if Reuben was compensated for his services rendered for the years in issue at the $27,000 salary level, based upon the aforenoted corporate balance sheets, L. & K. probably would not be in a financial position to distribute earnings.[11]

Therefore, after a careful review of the entire record, including a comparison of Reuben's salary paid with L. & K.'s income for the fiscal year ended January 31, 1965, to and including January 31, 1973, and L. & K.'s octogenarian's

---

[11] We note that, although the record is inconclusive to establish whether the L. & K. loan agreement with its bank prohibited the payment of dividends, the testimony is sufficient to establish that whether or not the clause was or was not in the agreement, had L. & K. paid a substantial dividend, bank officials would have been very disturbed.

contribution to the corporation for the years in issue, we repeat our holding that the payments in issue are reasonable in amount and made solely on the basis of employment-related considerations.

*Issue 2. Rental Expense for Rolling Road Store*

We must next determine whether the amount paid as rent by L. & K. in each of the 3 fiscal years involved, in excess of $64,000.08, for its Rolling Road store is an ordinary and necessary business expense under section 162. In the instant case the law pertinent to the resolution of this issue may be summarized as follows.

Section 162(a)(3) provides that a taxpayer may deduct all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business including:

(3) rentals or other payments required to be made as a condition to the continued possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

As in the case of salary or compensation, section 162(a)(3) does not specifically limit deductions for rental payments to a "reasonable allowance." Nevertheless, "When there is a close relationship between the lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger." *Roland P. Place,* 17 T.C. 199, 203 (1951), affd. 199 F.2d 373 (6th Cir. 1952), cert. denied 344 U.S. 927 (1953). Moreover, "The statute does not permit the deduction of an amount which is in no sense a legitimate business expense." *Limericks, Inc. v. Commissioner,* 165 F.2d 483, 484 (5th Cir. 1948), affg. 7 T.C. 1129 (1946). We must inquire as to whether amounts claimed as deductible rental payments were in fact something else paid under the guise of rent, *Potter Electric Signal & Manufacturing Co. v. Commissioner,* 286 F.2d 200 (8th Cir. 1961); *Stanwick's Inc.,* 15 T.C. 556 (1950), affd. per curiam 190 F.2d 84 (4th Cir. 1951), and the extent, if any, such payments were in excess of what was required to be made as a condition to the continued use and occupancy of the property. *Herbert Davis,* 26 T.C. 49, 56

(1956). Petitioner has the burden to prove that "payments were wrung from it by compulsion of circumstances delineated by law. The question whether surrounding conditions drove taxpayer through this narrow gate" is factual. *Utter-McKinley Mortuaries v. Commissioner,* 225 F.2d 870, 871, 874 (9th Cir. 1955).

Inasmuch as the parties have stipulated that the fair rental value for the years in issue of the Rolling Road property was $100,000 per annum net, or $27,000 a year greater than the amount of the increased rent, petitioner argues that we must examine all the evidence, in light of the situation known then to exist, to determine the true character of the payments and "to ascertain whether the rental arrangement was in fact sufficiently reasonable to achieve the same result as arm's-length dealings." *Jos. N. Neel Co.,* 22 T.C. 1083, 1090 (1954). Petitioner contends that the relevant facts bearing on the December 7, 1970, lease amendment are as follows: In order to construct the Rolling 40 West store, Rolling Forty, Inc., was required to borrow $350,000 from a bank. The bank insisted before agreeing to the loan that L. & K., as lessee, execute a written lease for such premises for a term at least equal to the bank loan and at an annual rent sufficient to service the mortgage, ground rent, taxes, etc. Only to satisfy the bank's demands, L. & K. by agreement dated September 16, 1963, obligated itself to lease this store and property for a period of 20 years at an annual rent of $64,000.08, this amount barely covering the amount necessary to service Rolling Forty, Inc.'s property costs and expenses. L. & K. (the lessee) and Rolling Forty, Inc. (the lessor), orally agreed in 1963 that the initial rent would be kept to a minimum ($64,000.08), such amount substantially lower than what an unrelated lessee would have paid, and that the rental would be increased to a more reasonable amount when the store became profitable.

On January 31, 1970, the lease for the Preston Street warehouse expired without right of renewal; the lease for the corporation's main store at Monument and Chester Streets was due to expire on May 30, 1971, also without right of renewal. With Reuben representing the lessors of the Rolling Road store, the Preston Street warehouse, and the corporation's main store, and William representing L. & K., Reuben insisted that, since the Rolling Road store was now profitable,

he would not agree to renew the leases for the corporation's main retail store and main warehouse until the Rolling Road rent was increased. In part, the increase was necessitated by Reuben's daughters' complaints to Reuben that they were not receiving any income from the lease and that it was costing them cash to own it. These circumstances led to a disagreement between Reuben and William and the parties consulted Isaac Benwitt and Harold Manekin to assist them in resolving their differences.

Therefore petitioner argues the factors which would suffice as adequate consideration and provide a legitimate business purpose for the amendment to the Rolling 40 lease are: (1) The prior oral agreement between Reuben and William to increase the rent when the store became profitable; (2) the agreement to renew the main retail store's and the main warehouse's leases only if the Rolling Road rent was increased; and (3) the specific consideration stated in the amendment to lease giving L. & K. an option to purchase the lessor's interest in the Rolling Road store for $600,000.

Respondent, on the other hand, argues that petitioner has not carried its burden of proving that such increased rental payments come within the statute and the aforenoted case law. Respondent contends that, other than Reuben's and William's self-serving testimony, the record is insufficient to establish any legitimate business purpose or consideration for the increased payments. L. & K.'s legal counsel in his protest letter on behalf of petitioner, submitted to the District Director of Internal Revenue for the purpose of arranging a conference with the Director's conference staff, during the administrative process of this case, failed to mention this prior oral agreement or the package arrangement negotiated to secure the amendment to the Rolling 40 lease. Moreover, petitioner has not introduced any records or financial statements to substantiate the lessor's expenses and income and that net income barely covered the amount necessary to service the property. Respondent contends that the increased rental payments were really part of a broad-based income and estate tax plan for the Levenson family.[12] The increased rent

---

[12] We note respondent's argument that the amendment was part of a broad-based scheme by the Levenson family to minimize income and future estate taxes of the family through the following: extension of the voting trust on Dec. 7, 1970; the

was therefore a distribution of L. & K.'s profits under the guise of rent.

While perhaps not entirely free from doubt, we find that petitioner has the better of the argument on this issue. In reaching this conclusion we are particularly impressed by the fact that the increased rent for the Route 40 West store was stipulated to be reasonable. This stipulated fact seriously weakens the argument that the rental payments were designed as a means to siphon off corporate profits. It makes it feasible to accept the testimony concerning the existence of an oral agreement to raise the rent when the store became profitable.[13]

From petitioner's point of view we note that its lease for two other pieces of property would soon expire. We have found that these leases were also renewed at figures that were reasonable. We agree with petitioner, as stated in *Jos. N. Neel Co.*, *supra* at 1090, "that it is entirely conceivable that the relations each with the other [of a family group], or their respective personalities, may be such that they will deal with each other strictly at arm's length. In fact, it sometimes happens that their very nearness in blood leads them to be more independent in action than strangers in blood."

In any event there certainly is no requirement that we recast the transaction as if it had been between strangers. While obviously Reuben had a basic commitment to petitioner's financial affairs, we find it realistic to accept the

---

corporate reorganization on Dec. 7, 1970, whereby Reuben's second preferred voting shares were exchanged for second preferred nonvoting shares; L. & K.'s Dec. 8, 1970, board of directors' resolution to purchase all of its first preferred shares (thereby eliminating Reuben's daughters' children as L. & K. shareholders); and Reuben's 1970 employment agreement with L. & K. Thus, respondent argues, as a result of these transactions, including the amendment of the Rolling 40 lease, Reuben retained 50 percent of control of L. & K., while decreasing the value of his stock for estate tax purposes, guaranteed his future financial security, increased his daughters' rental income, and gave his son more control and ownership of the corporation. Also respondent notes Reuben's gift of his 2-percent stock interest in Rolling Forty, Inc., to his daughters to give them 50-percent ownership of that entity. Further on Mar. 4, 1972, Reuben, William, Miriam, and L. & K. entered into two agreements for the corporation to purchase as many shares of Reuben's L. & K. shares on his death as would be necessary to pay his death taxes, with his remaining shares to be devised to William's son, Jerrold.

[13] We note that we need not decide when, within the ambit of the oral agreement, the store became profitable but only whether the agreement had become reasonably operative by the years in question. We admit to being disturbed by the fact that this oral agreement was not mentioned in the protest letter filed with the respondent. However, our obligation is to resolve the dispute in favor of one or the other.

testimony that, in negotiating these three leases, he was concerned with the financial welfare of his daughters[14] who would be the beneficiaries of the increased rent. In this respect he took an adverse position to his son, William.

Finally we give some weight to petitioner's contention that the option to purchase, granted petitioner in the revised lease, also constituted consideration for the increased rent even though the general corporate policy was not to buy "bricks."

As noted, respondent also contends that the increased rent was merely part of an estate plan for the Levenson family. This may or may not be so. However, even if it is, we prefer to resolve the matter on the limited finding that the amount paid was in fact rent and, as stipulated, was reasonable in amount.

## Issues 3 and 4. Legal and Professional Fees

Turning our attention to the treatment of certain legal and professional fees paid by L. & K. during its fiscal year ended January 31, 1973, the record separates such expenditures between the Pulaski Highway property and L. & K.'s proposed acquisition on Joppa Road. Dealing first with the Pulaski property expenditures, we have found that Pulaski Associates was formed to take title to the property and lease it back to L. & K. This form was utilized because L. & K. was not in the business of buying bricks, and Reuben desired, although William and his immediate family had 62.5-percent interest in the partnership, to provide his daughters with income on a net basis from this real estate entity. There is no dispute about this structural format. However, respondent contends that, when L. & K. paid the fees incurred with respect to rezoning, purchase, and leaseback of this property, it was paying the expenses of Pulaski Associates for the benefit of the partnership, the vice president of L. & K. and his wife, and as such the corporation may not deduct expenses of any other person or entity.

We do not agree. The L. & K.-Pulaski lease was on a net basis and the partnership was capitalized by the Levensons for the specific purpose of holding title to the property and

---

[14] We make this statement despite the rather mechanical nature of their testimony.

leasing it back to L. & K. The economic reality of the situation would have required Pulaski Associates to increase its rental fee had it paid these expenses. Pulaski Associates would have expected an economic return on this additional investment capital contributed to the partnership to meet these expenditures. Also, this increased rental would be deductible by L. & K. Instead, the form of this transaction let L. & K. pay these costs, decreasing the rent necessary for the lessors to have a minimum economic return on their property. Pulaski Associates would not have acquired the property but for the simultaneous leasing of the property to L. & K. Here, the substance of the transaction controls the form and it is the lessee, L. & K., who ultimately bears these costs, whether in the form of increased rentals or amortizable expenses. In our view, L. & K. will be entitled to amortize these costs of rezoning, leasing, and purchase of the Pulaski Highway property over the term the lease has to run under section 178(a)—32 years. See *Giumarra Bros. Fruit Co.*, 55 T.C. 460 (1970). Since we conclude that section 178 is applicable, it follows that these payments by L. & K. do not constitute preferential dividends to petitioners, William and Gloria Levenson.

Finally the expenses incurred by L. & K. in the possible acquisition or leasing of property located at Joppa Road, Towson, Md., unrelated to the Pulaski Highway property, are deductible in full. Respondent argues that when L. & K. abandoned its efforts to acquire this property, the moneys spent were nondeductible expenditures made for the potential future benefit of the Levenson family. We do not agree. Whether one characterizes the expenditures under section 162 in carrying on its business in the ordinary and necessary course thereof and/or under section 165 as a loss incurred in its business upon the abandonment of its plan to acquire or

lease the property, petitioner shall be allowed a deduction for its fiscal year ended January 31, 1973.

> *Decision will be entered under Rule 155 in docket No. 4060–75.*

> *Decision will be entered for petitioners in docket No. 4061–75.*