UNITED TITLE INSURANCE CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
United Title Ins. Co. v. Commissioner
Docket No. 10408-83.
United States Tax Court
T.C. Memo 1988-38; 1988 Tax Ct. Memo LEXIS 39; 55 T.C.M. (CCH) 34; T.C.M. (RIA) 88038; February 4, 1988. W. Gerald Thornton and David D. Dahl, for the petitioner. Frank E. McDaniel and Alan I. Weinberg, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's Federal corporate income taxes and section 6653(a) [1] negligence additions thereto as follows: Section 6653(a)
Year
Deficiency
Addition
1977
$ 13,738
$   687
1978
42,275
2,114
1979
32,529
1,626
*41 After concessions, [2] the issues for decision are: (1) Whether petitioner's expenses for three out-of-state trips for board of directors meetings and a fourth trip for a planning conference are ordinary and necessary business expenses within the meaning of section 162; (2) If so, whether petitioner has satisfied the requirements of section 274 for the trips; (3) Whether petitioner has satisfied the requirements of section 274 for activities related to an in-state board meeting; (4) Whether petitioner can deduct certain amounts paid to its majority shareholder as legal and investment counseling fees; and (5) Whether petitioner is liable for the section 6653(a) negligence additions. *42 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, the first supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference. Petitioner is a North Carolina corporation with its principal place of business in Raleigh, North Carolina. Petitioner filed its Federal corporate income tax returns (Forms 1120) for the years in issue with the Internal Revenue Service Center in Memphis, Tennessee. Petitioner was incorporated on January 30, 1975. Since its incorporation, petitioner has maintained only one corporate office, which at all times pertinent hereto has been in Raleigh, North Carolina. Petitioner is a real estate title insurance company doing business solely within the State of North Carolina, and principally in the eastern part of North Carolina. The North Carolina Real Estate Title Insurance Industry
In most North Carolina real estate transactions (residential and commercial) where the purchaser finances the acquisition, the lender requires the purchaser to obtain real estate title insurance. A title insurance company cannot insure a title until an attorney licensed *43 to practice law in North Carolina has examined the public records and rendered an opinion [3] on the title. See N.C. Gen. Stat. sec. 58-132(a) (1982). The opinion may not be rendered by an employee of the title insurance company. See N.C. Gen. Stat. sec. 58-132(a) (1982). Thus, in the ordinary course of a real estate transaction, an attorney is designated to examine the public records and render an opinion on this title. In a residential transaction, the lender, after approving the loan, sends closing instructions to a real estate attorney. In such instructions the lender usually designates the title insurance company to which the attorney is to *44 deliver the title opinion so that insurance may be obtained. The lender often designates a title insurance company with which it is affiliated. The lender's choice may also be influenced by the realtor or by the developer. If the attorney prefers to use a different title insurance company, he can request the lender's permission to do so, but such a request is seldom made. In other instances, the attorney is free to send his title opinion to the title insurance company of his choice. The purchaser of a residential property generally plays no role in deciding which title insurance company will issue the policy. In a commercial transaction, the attorney usually picks the title insurance company. An attorney chooses a particular title insurance company because of the company's expertise, the quality of service provided, and the attorney's relationship with the company -- in other words the company with which the attorney likes doing business. When a title insurance company receives an application for insurance and the accompanying title opinion, it reviews the opinion to assess insurability against adverse claims. Claims can arise from information in the title opinion or from *45 patent or latent defects in the title. A title insurance policy insures the ownership of the property subject to the specific exceptions enumerated in the policy and also subject to the standard exclusions that are the boilerplate language of the policy. [4] In determining whether to insure a title and whether any exceptions should be inserted in the policy, the title insurance company relies upon the title opinion. The opinion reflects the attorney's search of the public records regarding the ownership of an encumbrances on the property. A title insurance company has no control over how the attorney conducts his search of the public records or whether the attorney has someone else, such as a paralegal, actually perform the search. A title insurance company cannot afford to double-check the attorney's opinion by searching the records itself. Thus, in making their underwriting decisions, title insurance companies are almost wholly dependent upon the attorneys for whom they accept title opinions. *46 Because of their dependence on attorneys, most North Carolina title insurance companies maintain an "approved attorneys list," a list of attorneys from whom the company will accept insurance applications and accompanying title opinions. Before placing an attorney on their approved attorneys list, some companies require the attorney to fill out an application form giving information about the attorney's background and experience. The companies usually try to verify the information by contacting other companies for which the attorney claims to be approved and attorneys listed as references. Some title insurance companies rely primarily on information from other attorneys. When title insurance companies solicit business from an attorney, they also solicit the names of other attorneys who do real estate work. When such a company receives an insurance application from an attorney not on its approved attorneys list, the company checks with other attorneys about the applying attorney's reputation. Some companies are liberal with their approved attorneys list; other companies are more restrictive. Petitioner is quite restrictive and selective in placing an attorney on its approved *47 attorneys list. The North Carolina real estate title insurance business is highly competitive. Each title insurance company vies for the referral of business primarily from real estate attorneys, but also from lenders, realtors, and developers. The market is particularly competitive because all title insurance companies are selling essentially the same product -- standard American Land Title Association title insurance policies. In addition, their rate structures are essentially identical. The only way a title insurance company can effectively differentiate its product is by demonstrating the company's financial soundness and by providing the best service possible. During the years in issue, North Carolina title insurance companies used a number of marketing techniques to solicit business from real estate attorneys. Many companies had their employees take attorneys to lunch, dinner, and sporting events such as local college football and basketball games. Some title insurance companies had their employees call on attorneys at their offices, but this was not particularly effective because it disturbed busy attorneys during their working hours. A number of companies sponsored *48 cocktail parties at regular bar association meetings and educational seminars that were open to all members of the bar. Many title insurance companies advertised in state and local bar association publications. Companies also provided attorneys with pens, rulers, notepads, and calendars bearing the company's name. Some title insurance companies gave small Christmas presents to attorneys who sent them substantial business. The gifts, usually jars of jelly or preserves, pickles, or oranges, were of nominal value. Finally, some companies sponsored luncheons, informational brochures or newsletters, and courier services for attorneys and others in the real estate industry. In general, these practices may stimulate business and goodwill, provide a form of advertising, and facilitate the company's need to provide services to attorneys and other real estate professionals. Petitioner's Background
Petitioner was organized on January 30, 1975, by give individuals, including Charles L. Hinton III (Hinton), Walter R. Davis (Davis), [5] and Herbert L. Toms, Jr. (Toms). Of the 60,000 authorized and issued shares of petitioner's stock, Davis and Hinton originally acquired 21,000 shares *49 each, and Toms acquired 12,000 shares. Hugh Cannon (Cannon) and Richard G. Singer (Singer) were also original shareholders of petitioner, but the record does not indicate how many shares each of them owned. By mid-1977, Hinton had purchased the stock of Cannon and Singer and had acquired other shares so that he owned 75 percent of petitioner's stock. By December 8, 1978, Hinton had acquired Davis' stock and had become petitioner's sole shareholder. On December 26, 1978, Hinton transferred 10,000 shares to his mother, Mrs. Rebecca M. Davis, thereby reducing his holdings to about 83 percent. During the years in issue, petitioner had betweeen 11 and 14 members on its board of directors. Of these directors, only Davis, Hinton, Toms, and Singer were inside directors, having at sometime during the years in issue an interest in petitioner as a shareholder, officer, or employee. The remaining directors were independent outside directors who were practicing real estate attorneys in eastern North Carolina. *50 [6] During the years in issue, all of petitioner's outside directors referred business to petitioner. At the first meeting of petitioner's initial incorporators, held on February 13, 1975, Toms was elected president and general counsel and his compensation was set at $ 40,000 per year. Hinton was elected secretary and treasurer. No compensation was set for any other officer or employee, except that the board resolved to reimburse the officers for reasonable expenses incurred in furtherance of petitioner's business. During the years in issue, Toms and Hinton remained in their respective positions, and Davis was chairman of the board. Toms, petitioner's president and general counsel, was graduated from the University of North Carolina School of Law in 1958. He practiced law in Raleigh, North Carolina until 1966. From 1966 until petitioner's organization *51 in 1975, Toms served as president and general counsel for two of petitioner's competitors. Toms bears primary responsibility for petitioner's underwriting decisions. During the years in issue, Toms and two secretaries were petitioner's only full-time employees. Toms compensation for the years 1977 to 1979 was $ 42,800, $ 52,125, and $ 64,100, respectively. Petitioner was one of about 21 companies that issued title insurance in North Carolina during the years in issue. A number of these companies issued very little title insurance measured by premium volume. In terms of both assets and premium volume, petitioner was substantially smaller than most of its primary competitors. Because of petitioner's relatively limited capital, Toms adopted a conservative underwriting philosophy to minimize petitioner's risk of loss from adverse claims under its policies. For the three years in issue, petitioner incurred total losses of only $ 700, which compares very favorably with its competitors' losses. Like other title insurance companies, petitioner relied on attorneys' title opinions in issuing its policies. Because of this necessary reliance, petitioner and its competitors want to *52 know about an attorney's practice philosophy and procedure, education, and real estate knowledge. Toms believes that the only way to truly learn these things is to get to know the attorney. Because of its conservative underwriting philosophy, petitioner is quite selective in the attorneys, lenders, developers, and realtors with whom it does business. Petitioner's decision to place an attorney on its approved attorneys list is based on all the information it can obtain about the attorney and his practice philosophy and procedure, education, and real estate knowledge. In addition to being a new and relatively small company during the years before the Court, petitioner operated under other competitive disadvantages. Many of petitioner's competitors were affiliated with or controlled by national title insurance companies, or major North Carolina lenders and law firms, which provided business to the competitors. Because of its competitive disadvantages, petitioner did not use many of the customary marketing techniques used by other title insurance companies. Toms thought such techniques were too broad and general in scope. Instead, petitioner focused its efforts on establishing *53 and maintaining close business relationships with selected real estate attorneys and other real estate professionals who could refer business to petitioner. Petitioner also wanted to educate those selected individuals about petitioner's conservative underwriting philosophy, petitioner's dependence on attorney's title opinions, and particular problems petitioner encountered in underwriting titles. [7]
In pursuance of these marketing and educational purposes, petitioner sponsored seminars on current topics for real estate attorneys and others in the field. Petitioner advertised the seminars throughout the state and they were open to all members of the bar. Some of the seminars were held the day after a meeting of petitioner's *54 board. On at least two such occasions, petitioner hosted cocktail and dinner parties after its board meeting so that its directors could meet the seminar speakers. Petitioner also published a legal news bulletin about current developments in the North Carolina real estate industry. In addition to its seminars and and bulletin, petitioner entertained real estate attorneys, lenders, developers, and realtors during the years in issue. Petitioner took these individuals to college basketball and football games, out to dinner or for drinks, and on yachting excursions, and hosted cocktail and dinner parties, golf outings, and dances. The deductibility of the expenses petitioner incurred for these activities is not at issue in this case. In addition to these activities, petitioner incurred other travel and entertainment expenses that are at issue. Petitioner's Out-of-State Trips
Board Meeting Trips in General
During the years before the Court petitioner sponsored three out-of-state board meetings. [8] The board meetings were held in New Orleans, Louisiana, Las Vegas, Nevada, and Dorado Beach, Puerto Rico. Petitioner took on these trips its directors and other selected *55 North Carolina real estate attorneys, developers, realtors, bankers, and lenders, and their spouses or friends. [9] Petitioner's real estate guests were the "cream of the crop" of the eastern North Carolina real estate industry. The number of persons varied from 40 on the Puerto Rico trip to 93 on the New Orleans trip. See nn.8,9, supra.
The trips followed a common four-day pattern. The group spent most of the first day traveling from the Raleigh-Durham area to the destination. Petitioner always provided a continental *56 breakfast at the Raleigh-Durham airport before departure. On the morning of the second day, petitioner held a board meeting that its directors and real estate guests attended. At the board meeting, petitioner's officers and directors conducted general corporate business, including receiving operational reports from Toms and financial reports from Hinton, adding attorneys to petitioner's approved attorneys list, and electing officers. The formal corporate business led to broader discussions of topics of interest to both petitioner and its real estate guests who actively participated in such discussions. These topics included petitioner's conservative underwriting philosophy and the ramifications thereof, its approved attorneys list, particular policies petitioner had issued and the underlying transactions, and many technical problems encountered in the real estate businesses and practices of petitioner and its real estate guests. These business discussions continued and carried over into informal conversations among petitioner's directors and real estate guests during meals and other activities that took place on the trip. The record does not establish that the spouses and friends *57 and other non-real estate guests participated in any of these business discussions or activities; their role was purely social. After the board meeting, petitioner's directors and real estate guests had the rest of the second day and the third day at leisure. The group spent most of the fourth day returning to the Raleigh-Durham area. In addition to the board meeting, petitioner hosted other activities of a social nature during the trips. Petitioner sponsored the out-of-state board meetings for a number of business reasons and derived a number of benefits from them. The out-of-state board meetings enabled Toms and petitioner's directors to learn about the philosophy, procedures, and expertise of the real estate guests. Toms used this knowledge in his underwriting decisions and petitioner's directors used it in considering attorneys for petitioner's approved attorneys list. Petitioner explained to its real estate guests its particular underwriting philosophy and what petitioner expected from attorneys with whom it dealt. During the board meetings, petitioner revealed confidential information about its operations and financial soundness to its real estate guests so they could *58 be confident that petitioner, although a newcomer to the industry, stood solidly behind its insurance policies. At the board meetings, petitioner received input from its real estate guests on a variety of topics including petitioner's approved attorneys list, petitioner's conservative underwriting philosophy, and a number of technical problems as well. Petitioner's directors and real estate guests also discussed recent developments in the industry. Petitioner demonstrated to its real estate guests that although it was a young company its management was experienced and capable of handling any problem encountered. During these out-of-state trips, petitioner's real estate guests established working relationships with Toms such that they felt comfortable contacting Toms about title problems they encountered in their real estate businesses and practices. Petitioner's real estate guests also learned how to handle various problems and met other real estate professionals they could call on for advice. The out-of-state board meetings allowed petitioner to advertise its services and expertise to a select group of real estate professionals who were critical to its success or failure and *59 to do so more effectively than by other means of advertising. Finally, petitioner learned of potential sources of new business. Petitioner's real estate guests were experienced real estate attorneys, businessmen, and lenders whose opinions petitioner valued. Petitioner selected these guests because it thought they would appreciate petitioner's conservative philosophy and method of operation, and therefore would be more willing to do business with petitioner and otherwise contribute to petitioner's development. Petitioner's real estate guests were engaged in demanding businesses and legal practices. Petitioner believed that holding the board meetings out-of-state was necessary to ensure that the individuals it wanted to attend would do so. Holding the meetings at resort locations on four-day trips increased the willingness of petitioner's real estate guests to attend because it forced them to make plans in advance and set aside time for the trips and got them away from the daily demands upon their time. Petitioner invited the spouses because petitioner believed that too was necessary to insure good attendance. The fact that their spouses were invited made attendance more *60 attractive to some of petitioner's real estate guests, but was not a determinative factor. Real estate guests would have attended even if their spouses had not been invited. Petitioner's real estate guests attended because they were pleased to be invited on such nice trips and felt honored to be included in a select group of such well-respected members of the North Carolina real estate industry. After the trips, petitioner received letters from some of its directors and real estate guests in regard to the trips. The relationship between petitioner's principals and petitioner's real estate guests was essentially a business or professional relationship. Invitations to these out-of-state board meetings did not involve reciprocal social entertainment among personal friends, and most of petitioner's guests never entertained Toms or Hinton on similar trips or at any other social activities. Many of petitioner's directors and real estate guests had referred business to petitioner before the trips, and petitioner hoped they would continue to make such referrals after the trips. Petitioner's directors and real estate guests did not refer all of their title insurance business to petitioner. *61 Petitioner's directors and real estate guests referred business to petitioner because of the relationships they established with petitioner's officers and because of petitioner's efficiency and competence in handling title insurance policies. However, there is no evidence that the referrals were in any way a quid pro quo for the invitations to the out-of-state board meetings. There is no evidence that any of petitioner's competitors hosted similar out-of-state board meetings during the years in issue. However, real estate attorneys have asked petitioner's competitors when they were going to sponsor such trips. Since the years in issue, at least one competitor has begun to offer overseas trips to its insurance agents.
New Orleans -- May 26-29, 1977
During the period Thursday, May 26, 1977, through Sunday, May 29, 1977, petitioner sponsored a trip to New Orleans, Louisiana, during which it held its regular board meeting. Petitioner took 93 people on this trip: 10 directors, 24 real estate attorneys, 7 developers or realtors, 5 lenders, and 47 other persons including an airline representative, a tour guide, and spouses or friends. Petitioner held its board meeting commencing *62 at 10:00 a.m., on Friday, May 27, 1977. In attendance were petitioner's directors and its real estate guests. In addition to the board meeting, petitioner sponsored other activities during the trip. Petitioner provided its directors and guests with sight-seeing brochures. Petitioner's guests went on various sightseeing tours they paid for themselves. In addition, small groups went out to dinner together. Toms took a couple of small groups to dinner. During these dinners, Toms and his guests discussed business problems petitioner encountered and recent case law developments. Toms also learned about the guests' real estate practice philosophy and other matters important to petitioner. Petitioner also maintained a hospitality room, a large room containing tables, sofas, and chairs, as well as a small self-service bar with snacks. The room was open 24 hours and was a common gathering place for petitioner's directors and real estate guests. Petitioner's directors and real estate guests gathered there and discussed cases they had worked on or problems they shared in their real estate practices. On Sunday, May 29, just before the group left New Orleans, petitioner hosted a luncheon *63 for its directors and all other guests. At the end of the luncheon, Toms gave a brief speech and petitioner's guests thanked him for a wonderful trip. Petitioner paid the round-trip airfare for all 93 of its directors and guests and for bus service between the New Orleans airport and the hotel. Petitioner also paid for the rooms and room charges of its directors and for two of its other guests and their spouses. Petitioner paid double room rates of $ 55.75 (including tax) per night for ten rooms, a single room rate of $ 44.94 (including tax) per night for one single room, and a $ 278.20 (including tax) per night suite rate for a suite shared by the Hintons and the Singers. Petitioner incurred or reimbursed Toms and Hinton a total of $ 17,173.08 for the following expenses related to the New Orleans trip: Expense
Amount
Round-trip airfare
$ 10,947.74
Bus service
692.10
Rooms
2,638.62
Room charges *
494.47
Luncheon
1,290.18
Baggage
225.00
Board meeting room rental
and refreshments
130.87
Continental breakfast at
airport
196.35
Hospitality room supplies
134.06
Dinners for Toms and guests
256.40
Sightseeing brochures
67.78
Air prizes **
50.00
Tips and miscellaneous
49.51
Total
$ 17,173.08
*64 Las Vegas - May 19-22, 1978
During the period Friday, May 19, 1978, through Monday, May 22, 1978, petitioner sponsored a trip to Las Vegas, Nevada for its board meeting. Petitioner took 62 people on this trip: 9 directors, 13 real estate attorneys, 5 developers and realtors, 4 lenders, and 31 spouses and friends. Petitioner paid the round-trip airfare for these 62 persons. On the evening of Friday, May 19, petitioner hosted a dinner for its directors and guests at the Sultan's Table restaurant. At 10:00 a.m. on Saturday, May 20, petitioner held its regular board meeting. Present at the meeting were petitioner's directors and real estate guests. On Sunday, May 21, petitioner took its guests on a sight-seeing tour of Hoover Dam. That evening, petitioner paid for its directors and guests to attend a dinner show at the Casino de Paris. In addition, petitioner *65 paid for the hotel rooms, room charges, and golf green and cart fees at the Dunes Hotel and Country Club for its directors and guests. Petitioner paid for 30 double rooms at $ 40.78 (including tax and an automatic telephone charge) per night and for 2 single rooms at the same rate. Petitioner incurred or reimbursed Toms, Hinton, or Davis a total of $ 28,829.25 for the following expenses related to the Las Vegas trip: Expense
Amount
Round-trip airfare
$ 14,613.60
Separate airfare for Hinton
298.00
Continental breakfast at airport
123.71
Rooms
3,952.66
Room charges *
173.22
Dinner at Sultan's Table
4,000.00
Board meeting refreshments
50.54
Hoover Dam tour (transportation only)
736.00
Casino de Paris dinner show
and beverages **
2,072.52
Golf green and cart fees
172.00
Souvenir gifts ***
2,042.00
Reimbursements to Hinton for
miscellaneous meals, tips,
and travel expenses
250.00
Baggage and miscellaneous tips
332.00
Miscellaneous reimbursements
to Toms
13.00
$ 28,829.25
*66 Puerto Rico -- February 11-14, 1979
During the period Sunday, February 11, 1979, through Wednesday, February 14, 1979, petitioner hosted a trip to Dorado Beach, Puerto Rico for its board meeting. Petitioner took 40 individuals on the trip: 8 directors, 10 real estate attorneys, 1 developer, 2 lenders, and 19 spouses. At 10:00 a.m., on Monday, February 12, petitioner held its board meeting which was attended by its directors and real estate guests. At 8:30 p.m. on Monday, petitioner hosted a dinner for its directors and guests at the Su Casa Restaurant. Petitioner sponsored no other events for its directors and guests during the trip. However, petitioner's directors and guests at their own expense played golf, went to casinos and the beach, and went on various sight-seeing excursions while they were in Puerto Rico. Petitioner paid $ 145 per night for double rooms and $ 125 per night for single rooms for its directors and guests on the Puerto Rico trip. Petitioner incurred or reimbursed Toms a total of $ 21,058.12 for the following expenses relating to the Puerto Rico trip: Expense
Amount
Round-trip airfare
$  6,931.00
Continental breakfast at airport
78.54
Drink chits during flights
326.00
Transportation between San Juan
airport and hotel
445.00
Rooms and room charges *
13,106.83
Hotel charges for bellman service
80.00
Miscellaneous tips and parking
90.75
Total
$ 21,058.12
*67 Planning Conference - Key West - March 12-15, 1978
During the period Sunday, March 12, 1978, through Wednesday, March 15, 1978, petitioner sponsored a trip to Islamorada, Florida, an island resort located off the southeast coast of Florida near Key West, Florida (the Key West trip), for a corporate planning conference. Petitioner invited 11 individuals on the trip, six directors and five real estate attorneys. No spouses *68 were invited. Before the trip, Toms sent letters to the invitees requesting them to suggest topics to be discussed during the trip in addition to the topics he had in mind. On Monday and Tuesday morning, petitioner held planning conference meetings at which petitioner's directors and real estate guests discussed a variety of topics concerning petitioner's business. Petitioner held the planning conference because petitioner's underwriting philosophy had in that period been criticized as too restrictive or too conservative. Toms sought to question the directors and real estate guests about their views of petitioner's underlying philosophy and procedures. Toms found the meetings informative and he used this information in subsequently guiding petitioner's operations. Petitioner's directors and real estate guests also discussed a number of changes then taking place in the North Carolina real estate industry. In addition to attending these meetings, petitioner's directors and real estate guests played golf and/or tennis. Some of them also drove down to Key West and went to a famous bar called "Sloppy Joe's." Petitioner incurred or reimbursed Toms a total of $ 7,256.74 for the *69 following expenses relating to the Key West planning conference: Expense
Amount
Round-trip airfare *
$ 3,096.00
Car rental
353.38
Hotel rooms **
2,870.40
Meals and beverages at hotel
662.07
Hotel phone charges
3.53
Hotel tennis and golf fees
108.16
Liquor
92.37
Miscellaneous meals, tips
and transportation for Toms
36.83
Total
$ 7,256.74
Raleigh Board Meeting - October 6-9, 1977
On Friday, *70 October 7, 1977, petitioner held a special board meeting at the Velvet Cloak Inn in Raleigh, North Carolina. Petitioner sponsored a number of social functions before and after the meeting. On Thursday, October 6, 1977, petitioner hosted a golf outing at the Carolina Country Club in Raleigh. Twelve people played golf; Toms, two other directors, a North Carolina Supreme Court justice, and eight attorneys from eastern North Carolina. Petitioner incurred or reimbursed Toms a total of $ 225.34 for expenses related to the golf outing. [10]
At 10:30 a.m. on Friday, October 7, 1977, petitioner held its board meeting. All of its directors were present. There is no evidence that anyone other than the officers and directors attended the meeting. At the meeting, the board conducted regular corporate business, discussed the development of new business, and reviewed petitioner's marketing efforts. That evening petitioner hosted a cocktail-buffet party at *71 Toms' home. Petitioner invited its directors and 27 other people to the party. Petitioner incurred or reimbursed Toms a total of $ 627.81 for expenses related to the cocktail-buffet party. [11]
On Saturday, October 8, 1977, petitioner took its directors, 13 real estate people, and their spouses to a University of North Carolina -- Wake Forest University football game in Chapel Hill, North Carolina. Petitioner incurred expenses for tickets ($ 353.50) and transportation to the game ($ 135), totaling $ 488.50. In addition to the expenses described above, petitioner incurred expenses totaling $ 706.30 at the Velvet Cloak Inn for accommodations and meals for two of its directors and other unidentified individuals during the period of October 6-9, 1977. [12]
*72 Petitioner thus incurred total expenses in the amount of $ 2,047.68 in connection with the activities it hosted during the period October 6-9, 1977. Toms felt that the social activities and meals petitioner hosted before and after its October 7, 1977, board meeting gave him and petitioner's directors an opportunity to learn about the guests, their knowledge of real estate, their philosophy of doing real estate business, and the procedures they followed in searching titles. There is no evidence of any business discussions during these social events. Legal and Investment Counseling Fees
From petitioner's incorporation on January 30, 1975, through 1979, the last year in issue, Hinton (petitioner's treasurer, secretary, and majority shareholder) provided legal and investment counseling services to petitioner. Hinton had received his law degree from the University of North Carolina School of Law in 1973. Since that time, Hinton has continually practiced real estate law in Raleigh, North Carolina. In his practice, Hinton has searched hundreds of titles, and usually handles or supervises about 400 house closings each year. Hinton has also represented major developers in land *73 acquisitions, housing developments, and large construction and development loans. In addition, Hinton has dealt with every major lender in North Carolina and has represented many savings and loan institutions and mortgage bankers. In the ordinary course of its business from 1975 to 1979, petitioner needed outside legal counsel. Although Toms, petitioner's general counsel, was knowledgeable about title insurance underwriting, he was not knowledgeable about real estate law generally. Hinton provided outside legal services in regard to real estate law to petitioner from 1975 through 1979 on a daily basis. Hinton answered legal questions arising from petitioner's underwriting, established legal guidelines and company policies regarding frequently encountered legal issues and problems, kept Toms abreast of relevant changes in the real estate law, and reviewed and analyzed claims. Hinton sometimes also "covered" for Toms when Toms was out of petitioner's office, and helped Toms edit petitioner's real estate bulletin. Because petitioner was a new company with limited assets and an uncertain future, petitioner did not compensate Hinton for his legal services during 1975 and 1976. *74 During 1977, 1978, and 1979, petitioner paid Hinton or his law firm $ 10,000, $ 24,000, and $ 26,000, respectively, for legal services rendered. The amounts for 1978 and 1979 were suggested by Toms based on a monthly retainer of approximately $ 2,000 per month. In suggesting this figure Toms considered his prior experience with retainers in private practice, how much time Hinton spent on petitioner's legal matters, and his own preference for a retainer rather than hourly billing. Both Toms and Hinton considered this amount reasonable. Hinton did not keep an accurate record of the time he spent providing legal services to petitioner or to most of his other clients because petitioner paid him a set monthly retainer and most of Hinton's other clients paid fixed fees for his legal work. Hinton did maintain accurate time records for the limited work he billed by the hour. For most of his legal work, however, Hinton just tried to keep a rough estimate of his time so he had a general idea of what he was working on. During the period from 1975 to 1979, petitioner did not have in-house investment management capabilities. Investments are not within Toms' experience or expertise. *75 From petitioner's incorporation in 1975 through 1979, Hinton also provided investment counseling services to petitioner. North Carolina's law imposes on title insurance companies various capital, surplus, investment, and deposit requirements. See N.C. Gen. Stat. secs. 58-132(b), 58-79.1 (1982). As petitioner's investment manager, Hinton had to satisfy these legal requirements and maintain the safety and relative liquidity of petitioner's funds while maximizing the return on petitioner's investments. Hinton was solely responsible for investing petitioner's funds. He monitored petitioner's savings and checking account balances daily and if the checking account balance was high, he would move funds to an interest-bearing account. Hinton tracked interest rates on commercial paper, certificates of deposit, treasury bills, and banker's acceptances as well as the prime, Federal discount, and Federal funds rates. In addition, Hinton reviewed information from a number of stockbrokers and subscribed to many business publications such as the Wall Street Journal, Barrons, Forbes, and Forbes Business Week. Hinton also maintained business relationships with a number of stockbrokers. [13] *76 In the period 1975 through 1979, petitioner held *77 investment assets totaling between $ 753,180 and $ 1,007,860. Hinton kept most of petitioner's assets in cash equivalents such as certificates of deposit, commercial paper, repurchase agreements, and Treasury bills. Most of these obligations had 30-day maturity dates. Thus, many of petitioner's investments were maturing every 30 days, requiring Hinton to make new investment decisions. He frequently checked rates offered by various institutions and moved petitioner's funds accordingly. Hinton reviewed investment materials and made investment decisions both at his office during regular business hours and at his home in the evenings. During the years 1975, 1976, and 1977, petitioner did not compensate Hinton for his investment counseling services. Petitioner paid Hinton $ 36,000 during 1978, and $ 30,500 during 1979 for investment counseling services. In setting these fees, Hinton considered the large number of transactions necessitated by petitioner's investment goals, the percentage (of assets) fees other investment advisors charged, and the fact that he had discretionary control over petitioner's portfolio and the potential liability that goes with such discretionary control. *78 Toms considered these amounts reasonable because investments were not his field and if Hinton had not managed petitioner's investments, petitioner would have had to hire someone else to do it. Hinton did not base his fees on an hourly rate and he did not maintain time records for his work. During 1978, Hinton kept a rough estimate of time he spent on petitioner's legal and investment affairs on a desk calendar he kept at his office. He also wrote down appointments and maturity dates for petitioner's investments on the calendar. He did not take the calendar home or otherwise keep track of the time he spent on petitioner's business during nonbusiness hours. Hinton has never served as an investment counselor or advisor for any person or firm other than petitioner. Hinton's undergraduate degree was in history. Shortly after graduating from law school, Hinton attended the Young Executive Institute, a non-degree, "mini-M.B.A." program at the University of North Carolina's business school. This program was the only formal training Hinton received in business or investments. During 1975 through 1979, petitioner, following Hinton's investment counseling, earned investment income *79 in the following amounts: Investment
Year
Income
1975
$ 40,084.56
1976
44,462.10
1977
47,699.56
1978
73,944.01
1979
89,216.45
In 1978 petitioner paid $ 60,000 in dividends to its shareholders (Hinton and his mother). Two of petitioner's competitors retain outside legal counsel. They pay their outside counsel on a per hour basis and receive statements for services rendered. A third competitor has a law firm on a retainer of $ 150 per month for general corporate matters. If that company requires additional work such as the drafting of a lease or a profit-sharing plan, it must pay for those services in addition to the retainer. One of petitioner's competitors retains a related corporation to manage its investment portfolio of about $ 10 million in assets. This competitor pays the related corporation an annual fee of $ 6,700 for investment advice plus brokerage charges for purchases and sales. These competitors are not small new companies such as petitioner is. On its Federal income tax returns for the years in issue, petitioner claimed deductions as indicated: Item
1977
1978
1979
Travel and entertainment
$ 33,182.75
$ 48,636.28
* $ 12,349.04
Advertising
7,697.26
10,408.95
8,008.37
Planning conference
-    21,268.37
Total
$ 40,880.01
$ 59,045.23
$ 41,625.78
Legal and auditing
$ 12,545.00
$ 27,224.00
$ 27,342.50
Investment counseling
-    36,000.00
30,500.00
Total
$ 12,545.00
$ 63,224.00
$ 57,842.50
*80 In a statutory notice of deficiency dated February 25, 1983, respondent reduced petitioner's claimed deductions by the following amounts: Item
Amount of reduction
1977
1978
1979
Travel, entertainment,
advertising, and conference
$ 25,882
$ 43,308
$ 25,514
Legal, auditing, and
investment counseling
-
45,611
42,950
In other words, respondent allowed only $ 14,998, $ 15,737, and $ 16,201 for 1977, 1978, and 1979, respectively, for travel, entertainment, advertising, and conference expense and allowed only $ 17,613 and $ 14,893 for 1978 and 1979, respectively, for legal, auditing, and investment counseling expense. Respondent also determined section 6653(a) additions for each year. OPINION I. Out-of-State Board Meetings and Conference
The first two issues in this case involve the deductibility of petitioner's expenses for three out-of-state board meetings and an out-of-state planning conference. Petitioner is a North Carolina real estate title insurance company organized in *81 1975. During 1977 through 1979, the years before the Court, petitioner was not only a newcomer to the business, it was substantially smaller than most of its principal competitors. The North Carolina real estate title insurance industry is intensely competitive. Because of its competitive disadvantages, petitioner focused its marketing efforts on establishing and maintaining close business relationships with carefully selected real estate attorneys and other real estate professionals who could directly refer business to petitioner. Petitioner also sought to educate these individuals about, among other things, petitioner's conservative underwriting philosophy and restrictive practices. See n.7, supra.
During the years in issue, petitioner held three out-of-state board meetings and an out-of-state planning conference. Petitioner invited selected eastern North Carolina real estate attorneys, developers, realtors, and lenders on these four trips. Spouses and friends were also invited on the board meeting trips. Respondent argues that petitioner's trip expenses were not ordinary and necessary within the meaning of section 162, and that petitioner has not satisfied the requirements *82 of section 274 for the expenses. A. Ordinary and Necessary Expenses
Section 162(a) allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Whether an expense is ordinary and necessary is a question of fact. Commissioner v. Heininger,320 U.S. 467, 475 (1943); Walliser v. Commissioner,72 T.C. 433, 437 (1979). Each case turns on its own particular facts. Commissioner v. Heininger, supra,320 U.S. at 473. Although this issue necessitates a facts and circumstances inquiry and is a peculiarly factual matter, respondent seems to try to impose a legal test on the Court. Respondent argues that petitioner's expenses for the out-of-state board meetings and conferences were not "ordinary" within the meaning of section 162(a), relying on the following language from Deputy v. du Pont,308 U.S. 488, 495 (1940): [14]
Ordinary has the connotation of normal, usual, or customary. To be sure, an expense may be ordinary though it happen but once in the taxpayer's lifetime. Cf. Kornhauser v. United States, supra. Yet the transaction *83 which gives rise to it must be of common or frequent occurrence in the type of business involved. Welch v. Helvering, supra, 114. Respondent says the trips were not transactions "of common or frequency occurrence in the type of business involved" because "no other title company in the history of North Carolina had ever engaged in the practice of offering resort trips to real estate attorneys and others." Respondent chooses to focus on what he calls "resort trips" and to close his eyes to the business meetings and conferences that occurred at those locations, which will be discussed below. Respondent's *84 argument is based on a sweeping generalization that is not really borne out by the record, but which would not necessarily be determinative even if the factual predicate existed. In making his argument, respondent relies on general testimony by representatives of three competing companies stating that they did not sponsor similar trips and that they knew of no title insurance company other than petitioner that did. This testimony does not establish, and we decline to find as a fact, that "no other title company in the history of North Carolina" engaged in this practice. No witness claimed such all encompassing knowledge. Moreover, since the years in issue, at least one competitor has offered overseas trips to its insurance agents. Again it is a matter of whether one labels petitioner's "practice" as "offering resort trips" or as holding out-of-state board meetings and conferences. Out-of-state business meetings and conferences are not unknown in the business world. Moreover, even if petitioner were the only North Carolina title insurance company to hold out-of-state board meetings and planning conferences, that in itself would not mean the expenses were not ordinary within *85 the meaning of section 162(a). "[O]ne should not be penalized taxwise for his business ingenuity in utilizing advertising techniques which do not conform to the practices of one whom he is naturally trying to surpass in profits." Poletti v. Commissioner,330 F.2d 818, 822 (8th Cir. 1964). In any event, we reject respondent's attempt to convert the above-quoted language from Deputy v. du Pont into a narrow legal test of what constitutes an "ordinary" expense. Respondent, ignoring that this issue requires a facts and circumstances inquiry, tried and argued this case as if there existed some simple talismanic definition of the term ordinary, which the Court must apply by rote. The Supreme Court, in Welch v. Helvering,290 U.S. 111 (1933), long ago disabused us of such a simplistic notion. Discussing the concept of "ordinary" expense, Justice Cardoza cogently explained the problem facing the fact finder: One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle. [290 U.S. at 115.]
*86 Respondent's effort to transmute the Deputy v. du Pont language into such a "ready touchstone" is misdirected. Instead we must consider the record as a whole to make our determination. The record is clear that petitioner and its competitors routinely entertained real estate attorneys and others in the field. Petitioner, as a very small and new company, focused its marketing efforts even more narrowly and invited "the cream of the crop" of the eastern North Carolina real estate industry to three out-of-state board meetings and an out-of-state planning conference. Petitioner's selected real estate guests actively participated in the board meetings and the planning conference. These trips served petitioner's marketing and other business purposes at that point in its young corporate life. Entertaining attorneys and other real estate professionals was necessary in the North Carolina title insurance business because they were the principal source of business referrals and such activities were actively engaged in by petitioner's competitors. In Deputy v. du Pont,supra, the problem was that the expenditures did not arise out of the taxpayer's trade or *87 business. Here the expenditures for petitioner's out-of-state board meetings and planning conference clearly arose out of its conduct of its trade or business. Contrary to respondent's arguments, this case does not fall within the fact pattern of Walliser v. Commissioner,72 T.C. 433 (1979), which involved an admitted vacation trip. See n. 8, supra. Respondent contends that petitioner's trip expenses were primarily for social or goodwill purposes and thus not ordinary because petitioner had long-term relationships with its guests. Respondent emphasizes that a few of the guests were past or present law partners of Hinton (petitioner's secretary, treasurer, and majority shareholder) and that petitioner had entertained them on other occasions and/or received business from many other guests. Because of the obvious danger of abuse in the case of a small closely held corporation, such as petitioner, we must carefully scrutinize such travel and entertainment expenditures. Here, however, the facts simply do not demonstrate that the trips were primarily social functions. Petitioner has clearly established that the out-of-state board meetings and planning conference *88 served a number of bona fide business purposes. Responodent further argues that the trip expenses were not ordinary because the trips were rewards for the referral of business, [15] citing Car-Ron Asphalt Paving Co. v. Commissioner,758 F.2d 1132 (6th Cir. 1985), affd. a Memorandum Opinion of this Court. Compared Raymond Bertolini Trucking Co. v. Commissioner,736 F.2d 1120 (6th Cir. 1984), revg. a Memorandum Opinion of this Court. Respondent devotes many pages on brief discussing how agreements whereby attorneys would refer business to petitioner in exchange for trips like the ones in issue could injure the real estate industry and result in the kind of "graft and corruption" condemned in Car-Ron Asphalt Paving Co. Commissioner,supra,758 F.2d at 1134. Respondent engaged in baseless speculation.[16] There is no evidence and no offer of proof to show that petitioner ever received business from anyone with the understanding that he or she would in return be invited to an out-of-state board meeting or planning conference, or that petitioner engaged in any conduct contrary to any law or public policy. Even if there were some *89 indication of any such practices as respondent tries to conjure up, respondent's own regulations provide that "A deduction for an expense paid or incurred after December 30, 1969, which would otherwise be allowable under section 162 shall not be denied on the grounds that allowance of such deduction would frustrate a sharply defined public policy." Sec. 1.162-1(a), Income Tax Regs. See Commissioner v. Tellier,383 U.S. at 687, 690-695 (1966); Raymond Bertolino Trucking Co. v. Commissioner,supra,736 F.2d at 1125. We do not read Car-Ron Asphalt Paving Co. v. Commissioner,supra, as holding otherwise.[17] Based on the record as a whole, we conclude that petitioner's trip expenses, except as specifically noted below, were ordinary expenses. *90 Respondent argues that the trip expenses were not "necessary" because "all other companies found alternative and acceptable methods of competition and business practices." Respondent has not cited and we have not found any authority stating that expenses are necessary only if everyone else in the industry incurs them. The word "necessary" as used in section 162(a) imposes only the minimal requirement that an expense be appropriate and helpful to the development of the taxpayer's business. Commissioner v. Tellier,supra,383 U.S. at 689; Welch v. Helvering,supra,290 U.S. at 113; NCNB Corp. v. United States,651 F.2d 942, 948, n.9 (4th Cir. 1981). Petitioner has amply demonstrated that the trip expenses were appropriate and helpful and therefore "necessary" to its title insurance business. Based on the record as a whole, we find as a fact that petitioner's trip expenses, except as specifically otherwise noted below, were both "ordinary and necessary" as that term is used in section 162(a). Respondent argues that even if the board meeting trip expenses for petitioner's directors and real estate guests were ordinary and *91 necessary, the expenses for the airline representative, tour guide, and spouses and friends were not, because there was no business purpose for their attendance. Here we agree. Section 1.162-2(c), Income Tax Regs., provides that where a spouse is included on a business trip, the spouse's expenses are not deductible unless the spouse's presence serves a bona fide business purpose, and performance of incidental services is insufficient. Meridian Wood Products Co. v. United States,725 F.2d 1183, 1190 (9th Cir. 1984). The spouse must provide substantial services directly and primarily related to the business. Weatherford v. United States,418 F.2d 895, 897 (9th Cir. 1969). Compare United States v. Disney,413 F.2d 783 (9th Cir. 1969), and Bank of Stockton v. Commissioner,T.C. Memo. 1977-24, where the facts showed a business purpose for the spouses' attendance and showed that the spouses performed substantial services for the business. Here, no explanation is offered as to the presence of the airline representative and tour guides. Petitioner argues that inviting the spouses and friends served a business purpose *92 because it was necessary to get the real estate guests to attend. We do not agree. Our witness testified that he would have attended even if his wife had not been invited. More importantly, petitioner did not invite spouse to the Key West planning conference and was still able to attract the real estate guests it invited. Finally, there is no evidence that the spouses or friends provided any services whatsoever related to petitioner's business. Their presence and their activities were purely social. Thus, trip expenses attributable to the spouses and friends are not deductible under section 162(a). [18] Petitioner demonstrated no business purpose for the attendance of the airline representative, tour guide, and their spouses on the New Orleans trip. Expenses attributable to them are likewise not deductible. See n.18, supra.
In sum, the *93 reasonable trip expenses attributable to petitioner's officers, directors, and real estate guests were ordinary and necessary business expenses and therefore deductible under section 162(a). B. Section 274(a)[19]
Section 274(a)(1)(A) disallows deductions for entertainment expenses otherwise allowable under section 162 unless the taxpayer establishes that the entertainment activity was either (1) "directly related to" the active conduct of the taxpayers trade or business, or (2) in the case of entertainment directly preceding or following a substantial and bona fide business discussion "associated with" the active conduct of the taxpayer's trade or business. Section 1.274-2(c)(3), Income Tax Regs., sets forth the general requirements for the directly related test. [20]Section 1.274-2(c)(3)(i), Income Tax Regs., requires that the taxpayer have more than *94 a general expectation of deriving some income or other specific trade business benefit other than the goodwill of the persons entertained.Walliser v. Commissioner,supra,72 T.C. at 441. Respondent argues that petitioner incurred the trip expenses primarily for either social purposes or goodwill and therefore does not satisfy this requirement. Respondent says the trips were to desirable locations and that petitioner's officers, directors, and real estate guests had ample time to enjoy the pleasurable distractions available to them during the trips. These facts do not prove that the trips were primarily for social or goodwill purposes. *95 As discussed more fully below, petitioner held bona fide business meetings on each trip -- formal board meetings during three trips and a corporate planning conference during the fourth trip. The real estate guests participated in these meetings carried over into conversations among petitioner's officers, directors, and real estate guests during meals and other activities that took place during the trips. Also, as discussed more fully below, petitioner has established the business purposes for and business benefits from the trip. Petitioner has also satisfactorily explained the location and length of the trips. Petitioner's real estate guests were engaged in demanding businesses and legal practices. Holding the meetings at resort locations on four-day trips increased the willingness of petitioner's guests to attend because it forced them to make plans in advance and set aside time for the trips. Petitioner believed the out-of-state locations were necessary to insure that the real estate guests would attend and petitioner would achieve its business purposes for the trips. Petitioner's real estate guests attended because they were pleased to be invited on such nice trips and felt *96 honored to be included in such a select group of well-respected members of the North Carolina real estate industry. Respondent also contends that many of the guests were invited on more than one trip and had long-term relationships with petitioner. That does not show that the trips were primarily for social or goodwill purposes. Petitioner held the out-of-state board meetings for a variety of business reasons and achieved a number of business benefits from them. The out-of-state meetings enabled Toms and petitioner's directors to learn about the philosophy, procedures, and expertise of petitioner's attorney-guests. Toms used this knowledge in his underwriting decisions and petitioner's directors used it in considering attorneys for petitioner's approved attorneys list. Petitioner explained to its real estate guests petitioner's underwriting philosophy and what petitioner expects from attorneys with whom it deals. During the board meetings, petitioner revealed confidential information about its operations and financial soundness to its real estate guests so they could be confident that petitioner, although a newcomer to the industry, stood solidly behind its insurance policies. *97 At the meetings, petitioner received input from its real estate guests on a variety of topics, including petitioner's approved attorneys list, petitioner's conservative underwriting philosophy, and a number of technical topics as well. Petitioner's directors and real estate guests also discussed recent developments in the industry. Petitioner demonstrated to its guests that although it was a young company, its management was experienced and capable of handling any problem encountered. During the trips, petitioner's real estate guests established working relationships with Toms such that they felt comfortable contacting Toms about title problems they encountered in their real estate businesses and practices. Petitioner's guests also learned how to handle various problems and met other attorneys they could call on for advice. The trips allowed petitioner to advertise its services and expertise more effectively than other means of advertising. Finally, petitioner learned of potential sources of new business. Petitioner held the out-of-state planning conference in direct response to criticism that petitioner's underwriting philosophy was too restrictive and too conservative. Toms *98 sought to question petitioner's directors and real estate guests about their views of petitioner's philosophy. Toms found the meetings informative and used this information in subsequently guiding petitioner's operations. Petitioner's directors and real estate guests also discussed a number of topics of important to petitioner. These facts show that petitioner held the out-of-state meetings to obtain specific business benefits. Thus, petitioner had more than a general expectation of deriving (and derived) business benefits other than just the goodwill of its real estate guests. Section 1.274-2(c)(3)(ii), Income Tax Regs., requires that during the entertainment period the taxpayer must actively engage in a business meeting or other business transaction to obtain the income or other specific business benefits sought. Respondent suggests that the evidence does not sufficiently establish that formal business meetings took place during the trips. We disagree. The parties stipulated into the record minutes from the New Orleans and Las Vegas board meetings. Respondent suggests that these minutes do not adequately substantiate that formal business meetings took place. Respondent *99 highlights a host of what he views as deficiencies in the minutes. Respondent's arguments are simply unavailing. The minutes reflect meetings wherein petitioner's officers and board of directors conducted regular corporate business which led to discussion in which petitioner's real estate guests participated. There is nothing in the record casting a shadow on the authenticity of the minutes. Moreover, the record is replete with evidence such as confirmations of meeting room arrangements, hotel statements showing charges for meeting rooms and refreshments for coffee breaks during the meetings, and trip itineraries, as well as voluminous testimony establishing that formal board meetings took place during the New Orleans, Las Vegas, and Puerto Rico trips. Although petitioner could not locate the minutes from the board meeting during the Puerto Rico trip, the trip itinerary, confirmation of the meeting room arrangements, and the sworn testimony indicate that it was similar to the board meetings on the other trips. While it is not clear precisely how long the meetings lasted, the minutes from the New Orleans and Las Vegas meetings show that the meetings were of substantial length. *100 The planning conference meetings during the Key West trip were likewise formal business meetings. Petitioner prepared a formal agenda of topics to be discussed each day. The meetings were of substantial length to cover all of the topics on the agenda. In short, we are satisfied and find as a fact that petitioner actively engaged in formal, prearranged business meetings during the out-of-state trips. We think this fact provides a crucial distinction between this case and those cited by respondent. See Berkley Machine Works & Foundry Co. v. Commissioner,623 F.2d 298 (4th Cir. 1980); Hippodrome Oldsmobile, Inc. v. United States,474 F.2d 959 (6th Cir. 1973); Walliser v. Commissioner,72 T.C. 433 (1979); St. Petersburg Bank & Trust Co. v. United States,362 F. Supp. 674 (M.D. Fla. 1973), affd. without published opinion 503 F.2d 1402 (5th Cir. 1974). All of those cases involved trips, pleasure boat excursions, or other social outings during which the taxpayers' representatives informally mingled among the guests and discussed business during otherwise purely social functions. Here, in contrast, petitioner's *101 officers, directors, and real estate guests met in a hotel conference room [21] and conducted formal board meetings which were expanded to include discussions in which the real estate guests participated. The informal, general "shop talk" involved in the cited cases falls far short of the formal business conducted during the out-of-state meetings in this case. In conclusion, contrary to respondent's arguments, we conclude that the trip expenses attributable to petitioner's directors, officers, and real estate guests were directly related to the active conduct of petitioner's business. [22]
*102 C. Section 274(d)
Section 274(d) disallows entertainment expenses unless the taxpayer substantiates by adequate records or sufficient evidence corroborating his own statement (1) the amount of the expense, (2) the time and place of the entertainment, (3) the business purpose of the expense, and (4) the business relationship between the taxpayer and the person entertained. [23]Berkley Machine Works & Foundry Co. v. Commissioner,supra,623 F.2d at 906. These requirements are, of course, fleshed out in the requirements. See sec. 1.274-5, Income Tax Regs.
*103 Adequate records consist of an account book, diary, statement of expense, or similar record and documentary evidence which, in combination, are sufficient to establish the expense elements. Sec. 1.274-5(c)(2)(i), Income Tax Regs.; Berkley Machine Works & Foundry v. Commissioner,supra,623 F.2d at 906. If the taxpayer attempts to substantiate the expense element by his own statement, it must contain specific information in detail as to each element, and the corroborative evidence must be sufficient to establish the element. Sec. 1.274-5(c)(3), Income Tax Regs.; Berkley Machine Works & Foundry v. Commissioner,supra,623 F.2d at 906. Corroborative evidence of business purpose may be circumstantial. Sec. 1.274-5(c)(3), Income Tax Regs.
Respondent argues that petitioner has failed to establish the business purpose of the trips because "[t]he meetings, if they occurred at all, were not clearly defined and prearranged, but appear to be an afterthought to the entire trip." On the record before us, we simply cannot and do not agree. Attached to the minutes of the New Orleans and Las Vegas meetings are standard notices of the meetings addressed *104 to the board members and dated at least a week in advance of the meetings. Attached to the notices are affidavits certifying that the notices were mailed to the directors. Moreover, the minutes themselves reflect discussions of petitioner's operations and financial situation, and other matters such as petitioner's approved attorneys list, which obviously required preparation by Toms and Hinton before the meetings. Although petitioner could not locate the minutes from the Puerto Rico meeting, the record contains a letter from Toms to the Puerto Rico hotel that included a "Function Sheet" on which Toms specified the date, time, type of room required, and other requirements for the meeting. Almost one month before the Key West trip, Toms sent letters to the guests requesting ideas for topics to be placed on the agenda for the planning conference. Petitioner prepared a formal agenda of items to be discussed each day during the planning conference. Considering this contemporaneous documentary evidence, most of which respondent stipulated into evidence, we fail to see how respondent can continue to argue that the meetings did not occur or were "afterthoughts" to the trips. In any event, *105 we reject respondent's argument as without factual basis. Petitioner has clearly established the business purposes of its out-of-state board meetings and planning conference as required by section 274(d). We have previously discussed petitioner's business purposes for and business benefits from those out-of-state board meetings and planning conference. These purposes and benefits were specifically testified to by Toms and corroborated by board meeting minutes, the planning conference agenda, and the testimony of numerous witnesses. We think petitioner has satisfied the substantiation requirements of section 274(d). Compare Berkley Machine Works & Foundry Co. v. Commissioner,supra,623 F.2d at 906-907. II. Raleigh Board Meeting
On Friday, October 7, 1977, petitioner held a board meeting in Raleigh, North Carolina. In the four-day period from October 6-9, 1977, petitioner hosted a golf outing and a cocktail-buffet party, took a group to a college football game, and paid the weekend hotel bills for two of its directors and other unidentified individuals. Respondent agues that petitioner failed to substantiate the business purpose for these social *106 events as required by section 274(d). In this instance, we agree. Petitioner's social functions during this four-day period differ qualitatively and quantitatively from petitioner's out-of-state meetings. The business meetings were the focal point of the out-of-state trips. Petitioner's real estate guests attended and actively participated in those out-of-state meetings. The meeting discussions carried over into the remainder of those trips. In contrast, there is not evidence that anyone other than petitioner's own officers and directors attended the Raleigh board meeting. Thus, the business purposes evidenced by the meeting do not carry over to the surrounding social events, and the purported business purposes of these social events must be independently substantiated. The only evidence regarding the business purpose of the social events was Toms' testimony. He testified generally that the social events gave him and petitioner's directors an opportunity to learn about the guests' knowledge of and philosophy towards real estate. Petitioner offered no corroborative evidence. Moreover, there is no evidence of any business discussions actually taking place during any of these *107 social functions. Toms' general testimony, standing alone, does not satisfy the substantiation requirement of section 274(d). Secs. 1.274-5(b)(3)(iv), 1.274-5(c)(3), Income Tax Regs.; Berkley Machine Works & Foundry Co. v. Commissioner,supra,623 F.2d at 906-907. Thus, petitioner's expenses incurred for the social events surrounding the Raleigh board meeting are not properly deductible. [24]
III. Legal and Investment Counseling Fees
From 1975, when petitioner was incorporated, through 1979, Hinton, petitioner's majority shareholder, provided both legal and investment counseling services to petitioner. During 1975 and 1976, petitioner *108 did not compensate Hinton for his legal services. During 1977, 1978, and 1979, petitioner paid Hinton $ 10,000, $ 24,000, and $ 26,000, respectively, for legal services. Petitioner did not compensate Hinton for his investment counseling services until 1978, when petitioner paid Hinton $ 36,000. Petitioner also paid Hinton $ 30,500 for investment counseling services during 1979. Respondent disallowed a large portion of the deductions for fees paid during 1978 and 1979 because respondent did not consider these amounts ordinary and necessary within the meaning of section 162(a). Section 162(a)(1) allows as a deduction all ordinary and necessary business expenses, including a reasonable allowance for compensation for personal services actually rendered. To be deductible, compensation must be reasonable in amount and paid purely for personal services. Sec. 1.162-7(a), Income Tax Regs. The form or method of fixing the amount of compensation does not determine its deductibility. Sec. 1.162-7(b)(2), Income Tax Regs.
Whether payments are compensation for services rendered and are reasonable in amount are questions of fact to be decided based on the particular facts and circumstances *109 of each case. Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977), and cases cited therein. Petitioner bears the burden of proof. Botany Worsted Mills v. United States,278 U.S. 282 (1929); Rule 142(a). When a case involves a closely held corporation, we must closely scrutinize all the facts to determine the reasonableness of the compensation. Miles-Conley Co. v. Commissioner,173 F.2d 958, 960 (4th Cir. 1949), affg. 10 T.C. 754 (1948); Levenson & Klein, Inc. v. Commissioner,supra,67 T.C. at 711. There are a number of factors we must consider: the payee's qualifications, the nature, extent and scope of his work, the size and complexities of the business, a comparison of compensation paid with the corporation's gross and net income, the prevailing general economic conditions, the prevailing rates of compensation paid by comparable companies for comparable work, the taxpayer's general compensation policy, and in the case of small corporations with a limited number of employees, the compensation paid to the particular individual in prior years. However, no single factor is decisive. *110 Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949); Levenson & Klein, Inc. v. Commissioner,supra,67 T.C. at 711-712. Respondent argues that petitioner has not adequately proven that Hinton in fact provided legal and investment counseling services to petitioner and the amount of time Hinton spent providing these services. We disagree. We found both Hinton and Toms to be forthright and credible witnesses and their testimony to be wholly worthy of belief. Moreover, petitioner offered into evidence a copy of Hinton's 1978 desk calendar, which indicated that Hinton had spent time on petitioner's legal and/or investment matters virtually every business day that year. In addition, respondent did not disallow any portion of the deduction petitioner claimed for the $ 10,000 in legal fees paid to Hinton during 1977. Consequently, we reject respondent's argument, and based upon the testimony of Hinton and Toms, we find that Hinton provided substantial legal and investment counseling services to petitioner each year from 1975 through 1979. Hinton provided legal services to petitioner on a daily basis. Petitioner constantly needed *111 outside legal counsel because other than two secretaries, Toms was petitioner's only full-time employee. Tom's experience or expertise was in insurance underwriting and not in general real estate law. In making underwriting and other decisions, Toms needed legal advice from someone, such as Hinton, who had an intimate knowledge of real estate law. The record establishes the complex and involved nature of the legal services Hinton rendered to petitioner. Investments were also not within Toms' experience or expertise, and petitioner therefore needed someone to manage its assets. There were complex legal requirements to satisfy in managing petitioner's assets. This work required Hinton's daily attention to maximize petitioner's investment income. Respondent also argues that petitioner's payments to Hinton were excessive compared to payments made by comparable companies for similar services. The problem with respondent's broad argument is a lack of factual support. His comparisons are woefully inadequate. Two of petitioner's competitors retain outside legal counsel only on a per hour basis. This does not prove that the monthly retainer petitioner paid Hinton was unreasonable. *112 Another competitor has a law firm on a $ 150 per month retainer. This retainer covers only general corporate matters, and that competitor pays separately for any other legal work it requires. The record does not show what that competitor's total legal fees amount to. Another competitor with an investment portfolio of about $ 10 million in assets pays an annual fee of $ 6,700 for investment advice plus brokerage charges for purchases and sales. However, the investment advisor is owned by the same corporation as the competitor, and we cannot find that the fee thus charged is determined at arm's length. Because respondent's comparisons are inadequate, his broad argument is unavailing. Respondent also argues that petitioner's payments to Hinton were disproportionately large for his qualifications. We disagree. The record establishes that Hinton was reasonably qualified to render legal advice on real estate matters to a title insurance company. Hinton had no formal business education other than attending the Young Executive Institute, a non-degree, "mini-M.B.A." program at the University of North Carolina's business school. However, because he was petitioner's majority shareholder, *113 Hinton obviously desired to maximize the safety and profitability of petitioner's investment portfolio. He therefore could be expected to, and did, educate himself to whatever degree necessary to ensure that his investment decisions would achieve those goals. The record shows that he was successful in doing that. Respondent next contends that the disallowed portions of petitioner's payments to Hinton were constructive dividends, because as petitioner's income increased so did its payments to Hinton. Respondent argues that where a controlling shareholder experiences a sharp increase in compensation with no correlative change in the amount of character of services provided, the taxpayer must product persuasive evidence to justify the increase, citing Heil Beauty Supplies v. Commissioner,199 F.2d 193 (8th Cir. 1952). [25] Respondent also explains that the investment counseling fees petitioner paid Hinton during 1978 and 1979 were between 40 and 50 percent of petitioner's investment income during those years. Petitioner responds by pointing out that petitioner was not *114 incorporated until 1975 and was organized with the minimum capitalization required for title insurance companies. Petitioner needed to build up its reserves, and during 1975 and 1976 petitioner did not compensate Hinton for his services. In 1977, petitioner paid Hinton $ 10,000 in legal fees. Petitioner points out that it was not until 1978 and 1979, when it had built up sufficient reserves and enjoyed increased premium and investment income, that petitioner could afford to and did adequately compensate Hinton for the legal and investment counseling services he had provided to petitioner. The fact that petitioner did not compensate Hinton for his services until it could afford to does not convince us that the payments to Hinton were necessarily constructive dividends or unreasonable in amount. Petitioner's actions were entirely reasonable and largely explain the relationship between increases in petitioner's income and the payments to Hinton. It is clear that we must consider the compensation petitioner paid Hinton in past years in determining the reasonableness of the payments in issue. Mayson Mfg. Co. v. Commissioner,supra,178 F.2d at 119. Moreover, *115 say compensation petitioner paid Hinton during the years in issue for past services is deductible in the year paid. Lucas v. Ox Fibre Brush Co.,281 U.S. 115, 119-121 (1930). During 1975 and 1976 petitioner did not compensate Hinton for his legal services. Petitioner paid Hinton $ 10,000 for legal services in 1977, which respondent did not disallow. During 1978 and 1979 petitioner paid Hinton $ 24,000 and $ 26,000, respectively, for legal services, or a total of $ 50,000. This amount spread out over 1975, 1976, 1978, and 1979, is only $ 12,500 per year, a figure fairly close to the $ 10,000 petitioner paid Hinton in 1977, which respondent allowed. Petitioner paid Hinton $ 36,000 and $ 30,500 during 1978 and 1979, respectively, or a total of $ 66,500, for investment counseling. This total spread out over 1975 through 1979 is some $ 13,300 per year. Because Hinton provided essentially the same legal and investment counseling services from 1975 through 1979, but was not paid for them until the latter years, we think it reasonable to infer that at least some of the compensation paid during the later years was for services rendered in the earlier years. The last *116 factor we consider is that in 1978 petitioner paid Hinton and his mother dividends totaling $ 60,000. For the years 1977 to 1979, Hinton was engaged in the full-time practice of law in the real estate field, receiving from $ 30,000 to $ 50,000 a year from his practice. During those same years, he was paid a total of $ 126,500 for his part-time legal and investment counseling services to petitioner. During that same period, Toms, who was petitioner's president and general counsel and who worked full-time running petitioner's day-to-day operations, was paid only $ 159,025. Over a three-year period that would average out to $ 53,008 per year for Toms compared to $ 42,133 per year for Hinton. This comparison with his salary from his own full-time law practice and with Toms' salary suggests that some portion of United Title's payments to Hinton may have been disguised dividends being paid to the majority stockholder. However, since Toms was compensated in 1975 and 1976 and Hinton was not, Hinton's payments should be averaged out over a five-year period which would amount to $ 25,300 per year, which is more reasonable but perhaps still a little high for his part-time services. [26] *117 Based on all the facts and circumstances, we conclude that petitioner is entitled to deduct $ 43,500 of the total $ 60,000 in legal and investment counseling fees it paid Hinton during 1978, and $ 46,500 of the total $ 56,500 in legal and investment counseling fees it paid Hinton during 1979. That still adds up to total payments of $ 100,000 to Hinton in 1977, 1978 and 1979, but it averages out to $ 20,000 per year over a five-year period, which we conclude is reasonable for the services he actually rendered over that time span. [27]
IV. Negligence Addition
The final issue is whether petitioner is liable for the negligence addition. Section 6653(a) imposes an addition to the *118 tax if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. This case involved hotly contested and rather close factual issues, many of which we have decided in petitioner's favor, others we have decided in respondent's favor. We do not agree with respondent's contention that petitioner failed to maintain adequate books and records. A finding of negligence or intentional disregard of rules and regulations is unwarranted in this case. Thus, petitioner is not liable for the section 6653(a) addition in any year. To reflect the foregoing holdings and the parties' concessions, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
2. Petitioner conceded the nondeductibility of salary expenses in the amount of $ 4,255 for 1977, and club dues in the amount of $ 800 for 1978. The parties have settled other entertainment expense issues, but have not favored the Court with the details of the settlement. Respondent's adjustments to petitioner's charitable contributions deductions are automatic and therefore dependent upon the issues settled by the parties and those to be decided by the Court. The parties shall reflect the settled issues and the automatic adjustments in their Rule 155 computations. ↩
3. North Carolina law requires an "opinion." N.C. Gen. Stat. sec. 58-132↩(a) (1982). However, throughout the trial and in the briefs the parties and witnesses use the phrases "title opinion," "report on title," "certificate of title," and similar phrases interchangeably. There is a debate among North Carolina real estate attorneys as to whether a document containing title information submitted to a title insurance company is an opinion or a report, but in either event these documents contain essentially the same information. 4. There are four types of title insurance policies: a lender's policy, two types of owner's policies, and a construction loan policy. In North Carolina, a lender's policy insures the deed of trust securing the loan. ↩
5. At that time, Davis was married to Hinton's mother, Rebecca M. Davis. Respondent characterizes Mr. Davis as Hinton's "father-in-law," a term rarely used for a stepfather. ↩
6. Respondent on brief characterizes these independent outside directors as "honorary board members," a meaningless term which respondent seems to use in a pejorative sense. There is nothing in the record to suggest that these outside directors did not fully perform their duties as members of petitioner's board of directors. ↩
7. For example, petitioner has communicated to these attorneys that it will not issue a policy if the title opinion is "tacked." An opinion is tacked when an attorney obtains a prior title insurance policy on the property and just updates the opinion by checking the public records only from the effective date of the prior policy forward. As far as Toms knows, petitioner is the only North Carolina title insurance company that refuses to accept tacked opinions. ↩
8. Respondent argues that these were just vacation trips and that no board meetings were actually held. Based on the record as a whole, the Court is satisfied that board meetings were held and that substantial corporate business was conducted during each of the trips. As will be discussed below, the Court is also satisfied that these trips, at least as to the directors and real estate guests, accomplished other bona fide business purposes in the particular competitive environment in which petitioner was operating in these early years of its corporate existence. ↩
9. An airline representative, a tour guide, and their spouses also went on the New Orleans trips. ↩
*. Most of the room charges were restaurant charges by one of the directors, which petitioner paid along with other miscellaneous room charges such as long distance telephone calls by other directors. ** Apparently, these were prizes for some type of contest petitioner held during the flight to or from New Orleans.↩
*. Generally the room charges petitioner paid were for its directors, the real estate guests paying their own room charges. Some of the guests even paid the automatic phone charge of $ .50 per day which is actually part of the room rental. ** The dinners were $ 1,547.60 which included $ 1,474.36 for the 62 directors and guests, plus $ 73.24 for four persons who were "no shows." The record does not explain who these persons were or why they were invited. *** The expenditure was for silver trays as souvenirs for the directors and guests. The actual cost was $ 628 (40 trays at $ 15.70 each) but petitioner also paid another $ 700 and $ 714 for silver trays.↩
*. The record contains no breakdown of this amount. This figure obviously includes items other than rooms because 19 rooms at $ 145 per night for three nights = $ 8,265 and two rooms at $ 125 per night for three nights = $ 750, for a total of $ 9,015. The remaining $ 4,091.83 is unexplained. There is an indication that there was a room tax and certain automatic gratuities for maid service, and that there was no charge for banquets or meeting rooms. However, those amounts would not account for the $ 4,091.83. There is a further indication that petitioner paid certain meal and drink charges (but not room service charges), but the record does not disclose the amount nor whether it was for the directors and real estate guests or for all the guests.↩
*. Petitioner paid for 12 flights at $ 258 per flight. The invoice lists the individuals for whom flights were paid, including Fred Carmichael, who did not attend the planning conference. Thus, only $ 2,838 properly pertains to the Key West Planning Conference. Petitioner also claimed another $ 1,050 for transportation expense, but there is no evidence in the record to link that expenditure to this planning conference. ** This figure includes the amounts set forth on the Cheeca Lodge invoice as totals for the individuals and the amounts listed under "Master Folio." The hotel rooms figure of $ 2,870.40 is the sum of the total for the individuals ($ 2,605.20) plus the amount for "Room" under "Master Folio" ($ 265.20). ↩
10. The breakdown is as follows: ↩
Expense
Amount
Golf balls and prizes
$ 122.74
Green fees (8 golfers x $ 6)
48.00
Food and drinks at the
country club
54.60
Total
$ 225.34
11. The breakdown is as follows: ↩
Expense
Amount
Caterer
$ 276.00
Liquor and mixes
265.11
Bartender and maid
53.00
Napkins, candles, nuts, etc.
33.70
Total
$ 627.81
12. There is no evidence as to who occupied the rooms and why. One charge for 42 box lunches on October 8, 1977, suggests that the expenditure was related to the college football game that day. The only item that may be related to the board meeting is a luncheon check for 10 people on October 7, 1977, in the amount of $ 78.29, but even that item is not free of doubt. The Court cannot determine if some portions of the hotel charges related to a meeting room for the board meeting. ↩
13. A statement Hinton sent petitioner during 1978 for investment counseling services rendered itemizes those services as follows: * * * selection and monitoring of investments including purchase of certificates of deposit, commercial paper, money market certificates, stocks and bonds, treasury bill money market certificates, savings deposits; monitoring checking and savings accounts (daily), broker accounts, safety deposit box, interest income, statutory deposit, maturity dates of all investments and deposits; phone conferences and personal conferences with brokers, bankers and savings and loan personnel re investments; review and update company investment files; review and conference with company auditor and president re tax returns and Department of Insurance reports and filings; collecting and investing dividends and interest as maturing; analysis of investments, both potential and actual and stock market, housing market and general economy as they affect company financial positions; reporting on company financial position to management, board of directors and shareholders; overall responsibility for all of the above * * * ↩
*. Respondent's notice of deficiency listed this figure as $ 12,439, and the total for 1979 as $ 41,715 instead of $ 41,625.78.↩
14. We note that the courts, including the Supreme Court, also say that the purpose of the term ordinary in section 162(a) is to distinguish between capital expenditures and current expenses. See Commissioner v. Tellier,383 U.S. 687, 689-690 (1966); Welch v. Helvering,290 U.S. 111, 113-116 (1933); Raymond Bertolini Trucking Co. v. Commissioner,736 F.2d 1120, 1122-1125 (6th Cir. 1984); NCNB Corp. v. United States,651 F.2d 942, 948↩ (4th Cir. 1981). Respondent does not discuss these cases.
15. Respondent's argument is made despite the Court's rulings on petitioner's motion to strike certain material contained in respondent's trial memorandum, petitioner's objection to raising a new issue and/or amendment of answer, and respondent's motion to amend the pleadings to conform to the evidence. Two days after the calendar call and two days before the trial in this case was scheduled to commence, respondent filed his trial memorandum. In the memorandum, respondent for the first time raised the issue of whether petitioner had violated the provisions of the Real Estate Settlement Procedures Act of 1974 (RESPA), Pub. L. 93-533, 88 Stat. 1724, 12 U.S.C. sec. 2607(a), and N.C. Gen. Stat. sec. 58-135.1 (1982). RESPA makes it a crime punishable by imprisonment and a fine, or both, "to accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. sec. 2607(a)↩. Neither the federal nor state authorities violated these statutes. After a hearing on the matter, the Court granted petitioner's trial memorandum and stated that the Court would not receive any evidence on the issue. This was clearly a new issue requiring additional and different evidence on the eve of trial would have been prejudicial to petitioner, Court's clear rulings, respondent's counsel nonetheless sought to introduce evidence of discussions about the statutes at the audit level and moved to amend his pleadings. The Court refused to hear the testimony and denied the motion. However, the Court permitted respondent to make an offer of proof, and he offered to provide that during the audit the revenue agent discussed the possibility that the trips constituted violations of RESPA. However, this matter having been discussed during audit, there is no excuse whatsoever for respondent to have waited until two days before trial to try to raise the issue. The Court is satisfied that the matter was properly excluded. 16. Ignoring the Court's orders excluding this issue, respondent's counsel persisted in trying to resurrect this old canard in this oblique fashion on brief. Therefore, the Court feels constrained to address the issue briefly and to note that the offer of proof (see n.15, supra↩) made by respondent satisfies the Court that respondent could not have carried his burden or proof on this new matter in any event. Respondent's innuendos and insinuating remarks on brief ("a form of bribery," "borders on being illegal," etc.) are wholly unwarranted. 17. In Car-Ron Asphalt Paving Co. v. Commissioner,758 F.2d 1132 (6th Cir. 1985), affd. T.C. Memo. 1983-548, the Tax Court had found as a fact that the legal bribes or kickbacks were not "necessary," and the Sixth Circuit, while acknowledging the Raymond Bertolini Trucking Co. opinion of another panel of the Sixth Circuit, held that finding of fact was not clearly erroneous. The majority opinion went on to say: The United States Courts should never construe general language in tax statutes in a manner which rewards graft and corruption, albeit graft and corruption in private business. Such a construction burdens the economy unnecessarily and tends to promote dishonesty generally and specifically in commerce. [758 F.2d at 1134.]
This is the language respondent seized upon in its ordinary and necessary arguments here. While the sentiments expressed are noble ones, we respectfully point out that is not the basis for the Sixth Circuit's affirmance on our Memorandum Opinion. ↩
18. In their Rule 155 computations, the parties shall eliminate all expenses for airfare, meals, entertainment, and incidentals for those persons. However, as to the room expenses, the parties shall eliminate only the difference, if any, between the single room rates and the double room rates as room expenses attributable to spouses. ↩
19. Because of our holding that the trip expenses for the tour guide, airline representative, and spouses and friends are not deductible under section 162, our consideration of section 274 is limited to whether it disallows the otherwise allowable expenses for petitioner's officers, directors, and real estate guests. ↩
20. The regulations generally adopt the language of the legislative history for section 274. See H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 424-425. See generally, Berkeley Machine Works & Foundry Co. v. Commissioner,623 F.2d 898, 902-903 (4th Cir. 1980); Walliser v. Commissioner,72 T.C. 433, 439-442 (1979); St. Petersburg Bank & Trust Co. v. United States,362 F. Supp. 674, 677-679 (M.D. Fla. 1973), affd. without published opinion 503 F.2d 1402↩ (5th Cir. 1974). 21. On the Key West trip, petitioner arranged to have the living room of a villa set up to accommodate the two-day meetings. ↩
22. Because of our holding, we need not address petitioner's alternative arguments that its trip expenses satisfy the "associated with" test of section 274(a)(1)(A) and that at least certain of the expenses are not subject to the limits of section 274(a) because they fall within the exceptions then provided by section 274(e)(1) for business meals under circumstances conductive to business discussions and section 274(e)(6) for expenses directly related to business meetings of taxpayer's directors. We think that on this record petitioner clearly would satisfy the alternative "associated with" test. ↩
23. Respondent appears to concede all of these requirements for the out-of-state meetings except the business purpose item. If respondent does not so concede, it is clear from our findings of fact that the other requirements have been fully satisfied with the following minor exceptions. The $ 2,042 for silver trays for souvenirs for the Las Vegas trip is unreasonable in amount, appearing to be duplicate payments by petitioner; only the one $ 628 amount is properly substantiated. The expenditure for "no shows" at the dinner show in Las Vegas clearly related to persons other than the 62 invited guests, and that amount of $ 73.24 is not properly substantiated as an expense for this out-of-state board meeting. For the Puerto Rico trip, an amount of $ 4,091.83 of the hotel charges of $ 13,106.83 was unexplained, and therefore not properly substantiated. The airfare paid for a 12th person who did not attend the Key West planning conference is not allowable so the $ 3,096 should be reduced by $ 258, and only $ 2,838 is allowable. ↩
24. While the expenses of the board meeting itself would be deductible without regard to section 274 requirements, unfortunately petitioner failed to establish the nature and amount of such expenses. Since section 274 would not apply to the Raleigh board meeting as much, the Court could apply the Cohan rule, but there is simply no basis in the record for making any approximation and to permit recovery would be sheer "unguided largesse." Williams v. United States,245 F.2d 559, 560↩ (5th Cir. 1957). 25. Respondent also cites Laputka v. Commissioner,T.C. Memo. 1981-730↩. 26. Toms' salary was initially set at $ 40,000 per year, and if he was paid that amount in 1975 and 1976, his total compensation over the five-year period would have been $ 239,025 or an average of $ 47,805 per year. ↩
27. The reasonableness of any payments in any later year will depend on the reasonableness for services actually rendered in that future year, petitioner having now adequately compensated Hinton for the early years when he performed services with little or no compensation. ↩